## THE M. C. CURRIE.

(District Court, S. D. New York. May 28, 1904.)

1. SHIPPING—DAMAGE TO CARGO—DEFECTIVE COVERS.
    A vessel cannot be held liable for damage to a deck cargo of hay arising from defective covers, which were furnished by the shipper.

2. SAME—SWEATING OF HAY CARGO—HARTER ACT.
    A canal boat brought a cargo of hay from Quebec to New York, where it arrived in good condition. It was loaded by the consignor, and was to be unloaded by libelants, who had become owners of the bills of lading.

¶ 2. Statutory exemptions of shipowners from liability, see note to Nord-Deutscher Lloyd v. Insurance Co. of North America, 49 C. C. A. 11.

On arriving in New York the boat and cargo were seized by libelants under process from the state court in a suit against the consignor, and held on demurrage for some 30 days, when the suit was dismissed, and the cargo was unloaded. During such time the weather was damp, and the hay in the hold became musty. The vessel was seaworthy, having no more leakage than was usual in such class of boats. *Held*, that the damage was due to the long detention during the damp weather, and to the lack of ventilation, due to the manner of loading, which, combined, caused the hay to sweat, and neither of which was the fault of the vessel; that she was, moreover, exempted from liability by section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]), the injury having arisen from an "inherent defect * * * of the thing carried."

3. SAME—DELAY IN DISCHARGING—CHANGE OF CARRIER'S TO WAREHOUSEMAN'S LIABILITY.

Where a vessel is detained, after the expiration of the time for unloading, by the act of the consignee, her strict liability as a carrier ceases, and she is liable as a warehouseman only, for reasonable care in keeping the cargo.

In Admiralty. Action for damage to cargo.

Herbert P. Queal (Emanuel J. Myers, advocate), for libellants.
Hyland & Zabriskie, for claimant.

ADAMS, District Judge. This action was brought by Charles B. Morris & Company to recover from the canal boat M. C. Currie, the damages arising from a failure to deliver a cargo of hay in the good order in which it was received. The hay was bought in the Port of St. John, Quebec, Canada, about the 5th of July, 1903, from Gillaume C. Poulin and loaded on the Currie for transportation and delivery to the libellants in New York. The written part of the contract between the parties was as follows:

"Office of G. C. Poulin,

Dealer in Lumber, Pulp-wood, Cord-wood, Cedar Posts, and Telegraph Poles.

St. Johns, Que. June 19 1903.

Agreed between Capt. J. B. Currie & G. C. Poulin who hires my two Boats 'Webster Wagner' & 'M. C. Currie' to load with hay at Chambly & above Chambly—the Hay to be transported to New York at the rate of $2.50 two 50/100 Dollars per ton we to pay towing to & from Chambly to St Johns & we to furnish said boats with covers.           G. B. Currie
                                                                       G. C. Poulin

to be loaded &
unloaded inside of
4 days
Each ent after
which demurrage will
be charged of Four
$4.00 Dollars a day."

Subsequently a bill of lading was issued by the master of the boat, as follows:

"Shipped, In good order and condition, by G. C. Poulin of St Johns and consigned to ord Banq Nationale in and upon the Canal boat M. C. Currie whereof Capt G B Currie is Master for this present voyage, and now lying in Port of St Johns Que 1092 Bales of Hay 172484 pounds.

Being marked and numbered as per margin, and are to be delivered in the like good order and condition at the Port of 131st St. Hudson River New York. (the Act of God, the King's Enemies, Fire, and all and every the Dangers and

Accidents of the Seas, Rivers and Navigation, of whatsoever nature and kind excepted) he or they paying Freight for said Goods at the rate of $275.00.

IN WITNESS WHEREOF, the Master or Purser of said vessel hath affirmed to ——— Bills of Lading, all of this tenor and date, one of which being accomplished, the rest to stand void.

Dated at St. Johns this 9 day of July 1903          G. B. Currie."

(On margin)

> "Recd on a/c of Frt. One hundred & Twenty five
>           Dollars
>               G. B. Currie

Canadian Covers
>     to be retd to
>       St Johns
>         Que
>     If more than
>     179 tons on the two
>     boats, pay over run at the
>         rate of 2.50 per ton, for over run."

(Endorsed)

> "Deliver to the order of
>     FIRST NATIONAL BANK, NEW YORK
>       ON PAYMENT OF ALL CHARGES
>         WITHOUT RECOURSE
>         In Banque Nationale, St. Johns, P. Q.
>         I. T. Oppeel Manager
>             DELIVER TO
>             Chas. B. Morris & Co
>            WITHOUT RECOURSE
>              TO THE
>           FIRST NATIONAL BANK,
>              NEW YORK CITY
>              Geo. F. Parker
>               Asst. Cashr.
>         Deliver to order
>         Corn Exchange Bank Harlem Branch
>             Chas. B. Morris & Co."

The boat reached New York on the 21st day of July, 1903, and on that day, at the instance of the libellants herein, she and her cargo were seized as the property of Poulin, under proceedings instituted in a state court to recover the customs duties paid on 6 boat loads of hay, amounting to $1,807.13, purchased by the libellants, of which this was one. The boat and cargo remained under seizure for several days, when the plaintiffs having discovered that they had accepted drafts covering the amount claimed, those proceedings were discontinued and these commenced. In the meantime, demurrage had been accruing, which the libellants herein paid, together with the freight that was due.

The loading and unloading were not provided for by the written contract but it was understood between the libellants and Poulin, their consignor, that the latter was to do the loading and the consignee's part was to take the cargo within 4 days after arrival and pay the duty and the freight. Acting on this understanding, Poulin took entire charge of the loading and put some of the cargo on deck and some in the hold. The former was partly covered by tarpaulins furnished by Poulin but they were not large enough to fully protect the cargo should storms occur and a space of about 2½ feet from the deck was exposed. The cargo in the hold was mostly above the water line and dunnaged in the usual way.

The weather was comparatively dry during the voyage and the cargo reached New York in substantially the same condition it was in when shipped. Shortly after the boat's arrival in New York it became very damp and rainy. The discharging was not commenced until August 22nd and only finished the 25th and it was found that a considerable portion of the cargo was damaged, some of that in the hold being still wet and other parts dried out but musty. The exposed part of the deck cargo was weather stained, through having been wet.

With respect to the deck cargo, I recently have had occasion to consider a somewhat similar case, the question there involved, however, being one of demurrage claimed by the transporting vessel. It was held that the vessel's claim could not be defeated by the fact that the cargo was damaged, through defective covers furnished by the consignor. Graham v. Planters' Compress Company (D. C.) 129 Fed. 253. The principle is the same in this case and I adhere to such determination.

With respect to the cargo in the hold, I think the testimony makes it clear that the damage was due to the wet weather, in connection with the long time the hay was without adequate ventilation. The boat was in a seaworthy condition, with no more leakage than ordinarily good boats usually have. It is well known that vessels of this class are seldom, if ever, perfectly tight and that they require pumping occasionally. I find there was nothing unusual in the fact that in this case there was a trifling leakage, which made it necessary to pump once in every three or four days. The testimony shows that cargoes of this kind are apt to sweat, during such weather as prevailed while the vessel was being detained, especially where there is a lack of ventilation, which was the case here, owing to the manner of loading. I do not see upon what theory the vessel can justly be held, especially as it was in no way responsible for the detention or manner of loading; the former being caused by the libellants and the latter by the consignor. Moreover, even if a strict liability as carrier be originally assumed, such relation had ceased when the time expired for the discharge of the vessel, and in the period during which the damage occurred, the vessel could only be regarded as a warehouse and liable for want of reasonable care in keeping the goods. Carver on Carriage by Sea (3d Ed.) § 472; Clendaniel v. Tuckerman, 17 Barb. 184; McKee v. Hecksher, 10 Daly, 393.

Section 3 of the Harter act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) also provided for the relief of the vessel in a case of this kind, by the provision:

"Limitation of liability for errors of navigation, dangers of the sea, acts of God, etc.

Sec. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal

process, or from loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

The testimony shows that when a cargo of hay is held confined for an undue period, it becomes affected and damaged by sweat in the same manner as this one did. This loss arose from "the inherent defect, quality, or vice of the thing carried."

Libel dismissed.