## THE AKI MARU. *

### NIPPON YUSEN KAISHA v. LUMBERMEN'S NAT. BANK OF PORTLAND.

(Circuit Court of Appeals, Ninth Circuit. February 10, 1919.)

No. 3121.

1. SHIPPING ☞132(5)—DAMAGE TO CARGO—LIABILITY OF VESSEL—IMPROPER STOWAGE.

    Evidence *held* not to sustain the burden of proof resting upon a steamship to show that the bad condition of a shipment of eggs from Shanghai to Seattle, when delivered, existed before shipment, but to show that it resulted from improper stowage for such cargo.

2. SHIPPING ☞132(3)—SUIT FOR DAMAGE TO CARGO—BURDEN OF PROOF.

    A bill of lading issued by a ship for goods "apparently in good order and condition" is prima facie evidence that they were in such good condition as to anything visible or discoverable by inspection, and the ship has the burden of overcoming such evidence.

3. SHIPPING ☞132(1)—SUIT FOR DAMAGE TO CARGO—MEASURE OF DAMAGES.

    Where libelant has proceeded on the theory that damages for injury to cargo are to be computed on its market value at place and time of shipment, as provided in the bill of lading, the court is justified in awarding damages on that basis, although under the facts libelant may have been entitled to a larger award.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Suit in admiralty by Lumbermen's National Bank of Portland against Steamship Aki Maru, Nippon Yusen Kaisha, claimant. Decree for libelant, and claimant appeals. Affirmed.

Oliver C. McGilvra and F. G. Dorety, both of Seattle, Wash., for appellant.

Platt & Platt and Hugh Montgomery, all of Portland, Or., and Corwin S. Shank and H. C. Belt, both of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. The Lumbermen's National Bank, appellee, filed a libel against the steamship Aki Maru, respondent, and set forth that in November, 1914, a shipment of 1,500 cases of eggs was delivered to the ship in good order at Shanghai, China, but was in bad order at the time of discharge, December, 1914, at Seattle, Wash., and was receipted for by the appellee as being in bad order; that the shipment was damaged because improperly stowed in the lower after hold of No. 5 hatch in the warmest place on the steamship, which place by reason of temperature and lack of ventilation and excessive vibration was an improper place to stow eggs.

[1] The appellant, owner of the steamship, denied improper stowage, and alleged that any damage sustained was due to the inherent defect and bad condition of the cargo of eggs at the time of shipment, or to the extremely rough weather, or other causes within the exceptions of the bill of lading.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

255 F.—46     *Rehearing denied May 12, 1919.

Section 3 of the act of Congress called the Harter Act, approved February 13, 1893 (27 Stat. 445, c. 105 [U. S. Comp. Stat. 1901, p. 2946; Comp. St. § 8031]), is as follows:

"Sec. 3. That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel, nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

The District Court held that the eggs involved were fresh and in good condition at the time of their delivery to the steamship at Shanghai, China; that upon arrival at Seattle 575 out of a total of 1,510 cases were in marketable condition and were permitted entry, while 925 cases were condemned; that the steamship company had failed to show that the eggs were not in good condition at the time of their delivery to the steamship, and failed to establish the existence of any other cause whereby the steamship company would be relieved from liability for the damaged condition of the eggs at the time of their arrival. A decree was entered against appellant for $5,496.18, and the steamship company appealed.

Counsel for appellant confine their discussion of the evidence principally to the contention that the District Court erred in holding that the lower hold No. 5 hatch of the ship was not a proper or a suitable place for stowage of the cargo, and that the eggs were fresh and in good condition when delivered. Taking up the latter question first, the testimony introduced by the libelant was in substance that prior to the shipment of the eggs at Shanghai they were candled one by one before placed in the cases, and that every egg not strictly fresh was rejected; that the eggs were brought from the country collecting districts to Shanghai and sent to the candling warehouse, where experienced men judged of their freshness as soon as the eggs were received; that if a lot did not seem to be very fresh it was rejected before the candling test; that the eggs were received three or four days before the departure of the ship, and candled night and day in order to be shipped; that prior to shipment they were kept in a high-roofed cool building; that they were packed in the usual manner in egg fillers, each egg being put in a small compartment; that the instructions to the steamship company were to store the eggs in a cool place in the fore part of the ship; that the candling was done with an electric light, with a sheet of green covering the light and a hole in each sheet about the size of an egg; that these eggs belonged to the best class of eggs graded in Shanghai. Persons of special experience in dealing with eggs explained the process of candling and said that it enabled one to determine accurately the approximate age and condition of the contents of the egg.

For the respondents several egg merchants in China testified that from long experience in the business of shipping Chinese eggs they believed October and November were bad times to export them to America, because the heat in those months affected the eggs, which were generally carried over rough roads to Shanghai from the neighboring country by means of primitively made carts and baskets on the backs of coolies, and that some of these eggs came from 200 miles away, and others from about 33 miles from Shanghai. Much of the evidence of such persons, however, was of a general nature, not based upon direct knowledge as to where the eggs involved in the shipment came from. But in a deposition taken at appellant's instance by permission given since the case has been in this court, the Chinese merchant in Shanghai who sold 1,300 cases of the eggs to the shipper testified that they were brought from Woo Foo and other points about two days by steamer from Shanghai; that he knew nothing of the other 200 cases, but that the eggs he sold were good.

[2] The bill of lading contained a provision to the effect that the eggs were shipped in "apparent good order and condition, * * * to be carried upon said steamer to the port of Seattle, * * * and there in like apparent good order and condition to be delivered unto order or. his or their assigns." The principles which govern are well established. In Nelson v. Woodruff, 66 U. S. (1 Black.) 156, 17 L. Ed. 97, it was held that the signing of a bill of lading acknowledging to have received the goods in question in good order and well conditioned is prima facie evidence that as to all circumstances which were open to inspection and visible the goods were in good order; but it does not preclude the carrier from showing, in case of loss or damage, that the loss proceeded from some cause which existed, but was not apparent, when he received the goods, and which, if shown satisfactorily, will discharge the carrier from liability. "But," said the court, "in case of such loss or damage the presumption of law is that it was occasioned by the act or default of the carrier, and of course the burden of proof is upon him to show that it arose from a cause existing before his receipt of the goods for carriage, and for which he is not responsible." Argo Steamship Co. v. Seago et al., 101 Fed. 999, 42 C. C. A. 128; The Medea, 179 Fed. 781, 103 C. C. A. 273. The provisions of the Harter Act would not relieve the carrier from liability for damage to the eggs carried by improper stowage. Our judgment, therefore, is that, when all the evidence is considered and tried under the rule of law as stated, it must be held that appellant has not shown that the eggs were in bad condition before received for carriage.

The carrier having accepted the eggs, and it being plain that eggs are a kind of freight which requires special care in stowage, we inquire whether the lower hold No. 5 hatch was a proper place to stow the eggs. It appears that the ship is 460 feet long; that No. 5 hold is the aftermost one in the ship; that the eggs were all stowed between the floor or bottom of the ship, and in the forward part of the hold; that No. 4 hold is forward of No. 5, and between the engines and No. 5; that No. 5 hold is 72 feet long and 49 feet wide; that the driving shaft goes right through the No. 4 and No. 5 in the shaft alley, and

that there is more or less vibration made by the propeller; that No. 4 hold is 40 feet from the forward to the after bulkhead; that the vertical distance from the top of the after ventilator to the lower hold, where the eggs were stored, was about 30 feet.

A witness named Henningson, who had been in the business of handling eggs for many years, testified that he had examined the eggs contained in the 1,500 cases in controversy, and also examined other cases not here involved, but which were stowed in the same hold with the 1,500 cases, and that many of the cases in lots other than that in controversy were rotted. We quote part of the examination of this witness:

"Q. Did you determine, or have you any means of determining, the comparative temperature of the eggs in the 1,500 cases involved in this controversy at the time of your first examination of those eggs to which you testified yesterday? A. In handling eggs we, of course, open and examine immediately, or as soon as we can, every one of these shipments. I have met all of these shippers personally. The eggs on arrival on the Aki Maru were warm to the touch when I reached the dock and examined them. I could feel the heat in my hand.

"Q. What was the atmospheric condition at the dock as to temperature at that time? A. Here in Seattle?

"Q. Yes. A. I should say it was somewhere around 40°."

Another witness of experience testified that he examined the eggs before they were discharged from the ship, and that upon leaning over the hatch he found heat coming out of the hold and a foul smell; that if the eggs had been bad at the time of the original shipment there would have been a foul odor, and such condition would have been easily observed, and that upon the assumption that the eggs were strictly fresh when shipped, and had been candled before shipment, the condition in which they were in when they arrived at Seattle was due to excessive temperature, lack of ventilation, and too much vibration; that the vibration, with slight temperature, would be very injurious. It also appeared, from the evidence of men who had frequently shipped eggs from Shanghai to Pacific Coast ports, that such shipments had been received in good condition in every instance, except one, where the eggs had been stowed in the forward part of the carrying ships, and that it was customary to stow eggs in the forward hatches, above the water line and away from the boilers.

We do not think it necessary to state more of the evidence. We have examined it with care, and conclude that the learned judge of the District Court correctly held that the disturbance or vibration due to the stowage of the eggs in No. 5 hold, through which the propellor shaft passes, together with the heat in the hold and lack of better ventilation, caused the damage to the eggs, and that, the eggs having been delivered to the carrier in good condition, the carrier failed to show that it was free from negligence in stowage.

[3] The appellee asked this court to award a larger sum in damages than was fixed by the District Court. The amount awarded by the decree, $5,496.18, appears to have been made up in this way: Market value of 1,500 cases of eggs at $4 per case, $6,000; net amount received for the sale of 575 cases salvaged, after deducting expenses of

rehandling and recandling, $1,552.87. When this last amount is deducted from the $6,000, it leaves a balance of $4,447.13, upon which amount the District Court allowed interest from November 7, 1914, the date of shipment, and costs. The point made by the appellee is that the market value of the cargo ought to have been computed on the basis of such value at the place of destination, and not at the point of shipment. The testimony of qualified witnesses was that the value of the eggs in Shanghai at the time of shipment was $4. The libelant offered to prove that the market value of the eggs at Seattle was $6 per case. Counsel for the steamship company objected on the ground that by agreement of the parties in the bill of lading the measure of damages was the market value at the point of shipment and not at the place of destination. The clause of the bill of lading to which reference is made is as follows:

"In all cases of loss of any portion or the whole of said goods or merchandise the amount of claim shall be restricted to the cash value of such goods or merchandise at the original port of shipment, at the time of shipment, and that all claims for either partial or total loss or damage shall be ascertained and adjusted upon this basis of value."

The appellee makes the contention that such provision is not broad enough to protect the carrier where the damage has been the result of the carrier's own negligence, and cites in support of the argument Lowenstein v. Lombard, Ayers & Co., 164 N. Y. 324, 58 N. E. 44. The Court of Appeals of New York there held that a bill of lading which provided that all liability under it "shall be estimated on the basis of the actual market value of the goods at the place and time of shipment," was not broad enough to relieve the carrier, where the loss had occurred through its negligence or that of its servants.

But in the present case the appellee after some months had elapsed from the time of the arrival of the eggs in Seattle made up a detailed statement in support of its claim for damaged and destroyed eggs, and put the value of the 1,500 cases involved at $4.07½ per case. Moreover, in its libel it proceeded on the theory that damages should be awarded with relation to the value of the eggs at Shanghai, China.

Considering these circumstances, we believe that the District Court was justified in making the award with relation to the value of the eggs at Shanghai, China.

The decree is affirmed, with costs in favor of the appellee.