### THE TAMBA MARU.

(District Court, W. D. Washington, N. D.   November 5, 1919.)

No. 3815.

1. **Shipping** ☞123—**Nature of cargo must be considered in stowage.**

In the stowage of cargo the carrier is required to take into consideration the nature of the cargo and the causes which may effect its injury, including the season of the year where it is of a nature to be affected by temperature.

2. **Shipping** ☞132(5)—**Damage to shipment of eggs held due to improper stowage.**

Damage to a shipment of eggs from Shanghai to Seattle *held*, on the evidence, to have been caused by their improper stowage in a lower after hold, around and over the shaft tunnel, where the eggs were subjected to excessive heat and vibration, and were without proper ventilation.

3. **Shipping** ☞131—**Shipper held entitled to recover freight paid on damaged cargo.**

Where the damages recovered for loss and injury to cargo is measured by the market value at the port of shipment, libelant is also entitled to recover the freight paid.

In Admiralty. Suit by the Hazelwood Company against the steamship Tamba Maru; Nippon Yusen Kaisha, claimant. Decree for libelant.

Platt & Platt, of Portland, Or., for libelant.

Oliver C. McGilvra, of Seattle, Wash., and F. G. Dorety, of St. Paul, Minn., for claimant.

CUSHMAN, District Judge. The libel is in rem by the assignee of the bill of lading to recover for the loss of 1,769 cases of eggs, containing 30 dozen each, and for damage to eggs in the remaining cases, in a shipment totaling 3,400. The eggs were shipped from Shanghai, Oc-

tober 24, 1914, to Seattle, which port they reached November 21st of the same year. The causes of the loss and damage, as set forth in the libel, are:

That it was "improperly stowed in the lower after hold of No. 5 hatch, on both sides of, against, over, and upon the shaft tunnel back of the boilers of said steamship, in the warmest storage place on said steamship, which place, by reason of the temperature and lack of ventilation and excessive vibration, was an improper, unseamanlike, and wrongful place to store a perishable commodity such as eggs."

This suit is, in very many respects, similar—strikingly so—to the case of the Aki Maru, tried in this court before Judge Neterer, and later, upon appeal, before the Circuit Court of Appeals (255 Fed. 721, 167 C. C. A. 67). Among the more important points of similarity may be mentioned:

The recital in the bill of lading that the eggs were "received in apparent good order and condition"; that the ships in question—the Tamba Maru and the Aki Maru—are twin vessels; that the eggs in each case were gathered in the same locality, and therefore transported an equal distance to Shanghai; that at the time of shipment they were similar as to quality and inspected and candled in the same way; that they were stowed in the same part of the same hold; that the season of the year was the same in each case—the eggs in this shipment having been shipped on October 24, 1914, while those in the other case were shipped on November 4, 1914. The loss and damage in the two shipments were found at Seattle to be, relatively, in about the same proportion to the total shipment.

Claimant contends that the decision of the present suit should not be controlled by the decisions in the Aki Maru Case, because of certain claimed differences in the testimony. No contention has been made here that the conditions of the shipment in the Aki Maru Case were not actually, in all substantial respects, similar to those of the shipment now in question. Under the testimony of the manager of the steamship company, it could not well be otherwise:

"Q. The location of the eggs on the Tamba Maru shipment and the Aki Maru shipment was practically the same, was it not? A. I didn't quite hear the first of your question.

"Q. The location of the eggs on the Aki Maru shipment that came in December 5, 1914, was practically the same as the location of the eggs of the Tamba Maru shipment which came in November 21st, was it not? A. Each shipment was stowed in lower No. 5 hold of the respective steamer.

"Q. As to the stowage of the eggs on the ship? A. Yes; very similar.

"Q. What was the difference, then? A. The Tamba Maru had a larger number of cases of eggs.

"Q. That was practically the only difference? A. As far as I know, yes, sir."

In the Aki Maru Case, the Circuit Court of Appeals, under the recitals in the bill of lading, held, quoting from the decision in Nelson v. Woodruff, 66 U. S. (1 Black) 156, 17 L. Ed. 97:

" * * * In case of such loss or damage the presumption of law is that it was occasioned by the act or default of the carrier, and of course the burden of proof is upon him to show that it arose from a cause existing before his receipt of the goods for carriage, and for which he is not responsible."

Claimant undertakes in this case; as in that of The Aki Maru, to show that the cause of the loss and damage was the hot weather at the time of shipment and the then unfitness of the eggs. Claimant frankly states its position as follows:

"The whole issue here is as to whether this shipment was too early. Libelant concedes that summer eggs cannot be shipped successfully, and we concede that winter eggs can be. The whole question is as to where the line should be drawn. It is a sine qua non, therefore, in showing the similarity of other shipments, to show similarity in date and weather conditions, and no such evidence whatever is shown in this case."

While there may be other minor points of difference in the evidence in these cases, claimant's chief contention for a distinction in the two is based upon the following points and testimony:

Less care in the candling of these eggs is claimed to be shown than was taken with those upon the Aki Maru. This contention is based upon the opinion given by the witness Adler that 5 per cent. were rejected in candling, although he disclaims any recollection upon this point, while 60 per cent. were candled out at Shanghai before shipment on the Aki Maru.

In the memorandum decision by Judge Neterer, in the Aki Maru Case, it is shown that, in that case, the contention of claimant was that the rejection of such a large percentage of the eggs by the candlers showed that they were then generally tainted. The same claimant now takes the contrary position, and contends that the small amount rejected on candling shows that defective eggs were shipped.

As the eggs were candled at least twice before shipment, giving this argument full weight, it may only show that they were more thoroughly candled upon the first occasion in the present shipment, thus lowering the percentage rejected in the second candling. Again, if there is anything in either contention, there would probably have been a greater disproportion in the losses upon the two shipments after reaching Seattle; the conditions being so similar in all other respects.

A witness in the present case, not testifying in The Aki Maru, was C. H. Clark, who testified to handling two separate lots of Chinese eggs in Seattle, one lot purchased in 1914. Witness had so many complaints from purchasers that he had them recandled, and only put out to the trade the day they were candled. They were badly shrunken and showed effects of age. Another lot handled by this witness in 1917 showed that they were old from heat. He says that the Chinese eggs he has seen were about four months old; that there is a difference in the market price in Seattle of Chinese eggs and American eggs of from 8 to 15 cents per dozen; that eggs exposed to rain are not fit for shipment, because the rain washes off the secretion from the laying hen, which seals the pores of the shell and keeps out the air (the transcript of the evidence furnished the court says "water," but my recollection is that it was "air" of which the witness spoke); that, in his opinion, there would be some deterioration in the eggs in question between November 21st and December 5th, while they were on the dock in Seattle, before the work of candling began; that heat and rough handling destroy eggs more rapidly than age. There is no show-

ing as to how long the eggs referred to in either shipment mentioned by the witness had been in America before they came into his hands.

Thad R. Perry, who has been in the egg business 14 years, a witness in the Aki Maru Case for claimant and respondent in that case, testified to not having handled Chinese eggs. In the present suit, he testified that he had handled five cases of Chinese eggs, that he had observed them from a number of different shipments, that they were generally inferior in size and fullness, and virtually all that he had seen were shrunken, which indicated age.

Dr. Hall, a medical missionary in China for a number of years, was not a witness in the Aki Maru Case. He was located 1,000 miles from Shanghai, and, as I understand his testimony, in the interior of China, away from the seaboard. He had spent about 6 weeks in Shanghai, and gave general testimony as to the production of eggs in China, lack of care for the laying hens, and the keeping and transportation of eggs.

General testimony along this line was evidently given in the Aki Maru Case, as indicated by the opinion in the Circuit Court of Appeals. Dr. Hall testified:

"Q. What is the attitude of the Chinese henkeeper towards fresh eggs? A. He doesn't appreciate fresh eggs. They are flat. He likes them with a little taste to them.

"Q. Does he consider there is any advantage in getting an egg to the table as soon as it is laid? A. No; no; they are too flat. If they are a little old, they have a better flavor."

If old eggs are preferred to fresh by the Chinese, there would appear to be no incentive, in candling eggs, to try to smuggle stale ones into the fresh, because of the local demand for the former. This preference on the part of the Chinese, composing, doubtless, the vast majority of the customers in the interior, and the well-known reluctance of Chinese to any change in custom, might account for the difficulty this witness experienced in obtaining fresh eggs from the local dealers, but it would in no way interfere with the thorough candling of eggs desired for export.

E. L. Corcoran, who was one of the men who worked at candling the eggs in this shipment in Seattle, says that they were hot weather eggs, meaning that they were laid in hot weather, and, from his experience, he pronounced them "anyway from 2 to maybe 4 months old." His opinion being so worded, I do not feel warranted—even taking his opinion at its face—in finding the eggs to be over 2 months old. So considered, this evidence is not greatly at variance with that of libelant, for, allowing 2 days in China for the transportation of the eggs to Shanghai, 2 days for candling the eggs there, 29 days upon the voyage, and 14 days upon the dock in Seattle, makes a total of 47 days. This computation does not include the time preceding the shipment from the local market in China to Shanghai, and would not in any way discredit the opinions expressed in the testimony relied upon by claimant to the effect that eggs 30 days old in China would be too old to ship.

Cheng Yuen Sing, the Chinese merchant from whom Giesel & Co. purchased the eggs, testified in the Aki Maru Case as to a conversation had with the agent of the compradore of Giesel & Co. Concerning this

conversation in that case, he testified that the conversation was all about the egg business; about the shipment of 3,400 cases the previous month; about a contemplated shipment; chiefly about price, quality of goods, etc. Nothing was said about cold storage. This shipment was to be made the same as the previous one. At the time of the conversation, the eggs were good. "I told him they were the same as the previous shipment" (referring, evidently, to the 3,400 cases involved in the present suit). The weather in Shanghai during the months of October and November, 1914, was not good for shipping eggs to America, being sometimes cold, sometimes warm, and sometimes rainy.

In that case, the witness appeared to volunteer but little information. In the present case, he testifies:

"I had a conversation with Lo Tah Chang, who is the compradore of Giesel & Company. Lo Tah Chang came to me and told me he had a telegram from America ordering him to buy eggs. I said the weather was not favorable for buying eggs to send to America, unless the eggs were put up in cold storage. Then Lo Tah Chang returned to his office, and after a while he telephoned for me, but I did not go. The following day he sent me a chit, asking me to go to his office, and I called at his office, and he talked to me about the egg business again, and I told him that the weather was too bad for shipment of eggs, unless they were shipped by cold storage. He told me he had made diligent inquiries, and could find no cold storage available. I told him that without cold storage eggs are not reliable, and I did not want to do the business, because I might have spoiled my reputation. We met again the following day, and I asked if he could get any cold storage, and he said it was impossible, and he asked me if the eggs I was going to sell him were good, first-class, fresh eggs. I said, 'Yes, I will sell you good, first-class, fresh eggs for Shanghai.' Lo informed me that other companies were shipping eggs, and he asked me if I was unwilling to sell eggs to him. I said I was not unwilling to sell eggs to him, but I will deliver the eggs, and after he examined the eggs, and accepted them, that I would take no responsibility whatsoever. Then I sold the eggs."

No satisfactory reason appears why the apparent willingness of this witness should be so much greater, and his recollection so much better, concerning a conversation long past—as the one was in the present case—than they were in the former case. Being taken at its face, this evidence is not essentially different from other testimony given upon the trial of the Aki Maru Case concerning the bad weather conditions for shipments over this route in October and November. While it is testimony given by the seller of these eggs to the representative of the exporter, it does not establish that these particular eggs were in any way inferior.

It appears in the present suit that, in the Aki Maru Case, it was not disclosed that a number of October and November shipments over the southern route to San Francisco, mentioned by the witness Henningsen, were in fact, under refrigeration. The contention is now made that the decisions of both courts in that case were made upon the assumption that these shipments were stowed forward, without refrigeration, and that this assumed state of facts controlled those decisions.

The shipping season in question, of 1914 and 1915, spoken of by the witness Henningsen particularly, I understand to refer to the fall of 1914, the winter of 1914–1915, and the spring of 1915. There is but

one shipment of eggs from Shanghai to Seattle shown to have been made during that season earlier than the one in question. These eggs were shipped October 16th, and consisted of 350 cases, not under refrigeration, and reached Seattle in good condition, it would seem.

The point is made that this was not a large shipment. There is nothing in the evidence to show any advantage possessed by a small shipment over a large one in the respect in question. The evidence as to early shipments in other years is general, and is given by the witness Henningsen, who has imported 75 per cent. of the eggs brought to this country from China since the tariff was taken off in 1913. This witness did not have his records as to other years, and, although he offered to look them up, was not required to do so.

This general evidence supports libelant's contention as to the propriety of shipments without refrigeration in October and November, if properly stowed. That such stowage as these eggs were given is likely to result in loss is strikingly shown by one instance stated in the testimony of the witness Henningsen. He testifies that, in a shipment from Shanghai, reaching Vancouver, B. C., February 26, 1914, on the Canadian Pacific steamship Empress of India, which consisted of 8,000 cases there were 1,043 cases loaded aft, and the remainder were loaded forward above the water line. The 7,000 cases loaded forward above the water line reached Vancouver in perfect condition, but the 1,043 loaded aft, out of the same shipment, were very badly damaged. The 1,043 cases netted less than $1 a case, while the balance, loaded forward, netted an average of $5 a case.

[1] It is a further significant fact, and one relied upon by the District Court in the Aki Maru Case, that, since the losses incurred, resulting in this suit and the case of the Aki Maru, claimant has stowed all eggs not under refrigeration forward. In the opinion of Judge Hunt in the Aki Maru Case, it is said:

"The carrier having accepted the eggs, and it being plain that eggs are a kind of freight which requires special care in stowage, we inquire whether the lower hold No. 5 hatch was a proper place to stow the eggs." 255 Fed. at page 723, 167 C. C. A. 69.

The effect of this is that special care should be taken where there is a particular danger. See, also, The San Guglielmo (D. C.) 241 Fed. 969, at 977. It logically follows that, if the season of shipment increased the danger, increased caution in stowage was required to offset the danger.

[2] No contention has been made but that the conditions of the shipment in question in the Aki Maru Case were actually, in all substantial respects, similar to those of the shipment now in question. Claimant was allowed ample time to procure further evidence in the Circuit Court of Appeals after the adverse decision of the District Court in the Aki Maru Case, and failed to produce sufficient evidence to establish any mistake in that decision, resulting in its affirmance by the Circuit Court of Appeals. The new evidence now offered in this court should, under such circumstances, be of a positive, important, and decisive character, to persuade this court to reach a conclusion con-

trary to that reached by those courts upon the issues, and it is not of that character. I conclude, as did those courts, that—

" * * * The disturbance or vibration due to the stowage of the eggs in No. 5 hold, through which the propeller shaft passes, together with the heat in the hold and lack of better ventilation, caused the damage to the eggs, and that, the eggs having been delivered to the carrier in good condition, the carrier failed to show that it was free from negligence in stowage." 255 Fed. at page 724, 167 C. C. A. 70, opinion.

[3] The question as to the measure of damage remains. The market value of the eggs in Shanghai is shown to have been $4 per case. Under the rule laid down in the Aki Maru, the libelant is entitled to recover the Shanghai value of the 1,769 cases which were a total loss, together with the difference between the Shanghai value of the 1,631 salvaged cases and the net amount realized. But, in the present case, libelant was permitted to amend its libel and recite a further claim of damages on account of freight paid upon this shipment of eggs from Shanghai to Seattle of $1,457. The allowance of this further item of damage would appear proper (Pennsylvania R. R. Co. v. Olivit Bros., 243 U. S. 575, 37 Sup. Ct. 468, 61 L. Ed. 908), unless, as contended by claimant the ruling of the District Court and the Circuit Court of Appeals in the Aki Maru Case—that the Shanghai price was the measure of damage, and not the Seattle price—was controlled, primarily, by the fact that, after some months had elapsed from the time of the arrival of the eggs in Seattle, libelant made up a detailed statement in support of its claim for damaged and destroyed eggs, and placed their value at the Shanghai price, and that the libelant proceeded on the theory that the damages should be the value of the eggs at Shanghai.

In view of the wording of the bill of lading, restricting the claim to be made to the cash value of such goods or merchandise at the original port of shipment at the time of shipment, the holding of these courts would probably have been the same, in the absence of any such admission in the claim of libelant. Any reason requiring a claim to be made would not be applicable to such an item, where the freight was, in fact, paid to the party responsible for the damage. Such party would be presumed to know as much about that as the complaining party. Under the authority of Pennsylvania R. R. Co. v. Olivit Bros., supra, the freight paid upon this shipment, $1,457, will also be allowed.

The question of what, if any, interest should be allowed, has not been presented or considered.

─────────────────────────────────────────
☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes