### MONNIER v. UNITED STATES.

(District Court, E. D. New York. May 26, 1925.)

No. 3462.

1. Carriers ⬰52(2)—Provision in bill of lading that goods were received in apparent good order is only prima facie evidence of fact.

Provision in bill of lading that bags of quebracho extract were received in apparent good order and condition *held* only prima facie evidence that goods were in good order as to all circumstances open to inspection, and did not preclude carrier from showing loss resulted from some cause which existed, but was not apparent, at time of receiving goods.

2. Carriers ⬰132—Shipper of quebracho extract, subject to inherent vice, must prove good condition at time of shipment.

Where shipment consisted of quebracho extract, which was subject to inherent vice, shipper must prove that it was in good order and condition at time of shipment, since recital in bill of lading that it was received in apparent good order and condition relates only to external condition.

3. Shipping ⬰141(1)—Fusing together of bags of quebracho extract during shipment constituted "change of character," within exception of bill of lading.

Fusing together of bags of quebracho extract during transportation from Buenos Aires to Boston *held* to constitute a "change of character" of extract, and within exception of bill of lading.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Change.]

4. Shipping ⬰141(1)—Necessary effect of climate and heat on quebracho extract, when ship passed through equatorial region, was within exception of bill of lading.

Where ship transporting quebracho extract from Buenos Aires to Boston passed through equatorial region in early fall, shipment must have been affected by climate and heat, and will come within exceptions of bill of lading.

5. Shipping ⬰123—Stowage of quebracho extract between-decks between No. 1 and No. 2 hatches from Buenos Aires to Boston held not negligent.

Stowing quebracho extract in shipment from Buenos Aires to Boston between-decks, between No. 1 and No. 2 hatches, *held* to have constituted proper stowage, as not being close to engine or boiler room.

6. Admiralty ⬰25—Respondent, after admitting jurisdiction in answer, cannot ask dismissal of libel for failure of proof of jurisdiction.

Where respondent admitted jurisdiction in its answer, it cannot, after trial, ask for dismissal of libel because of libelant's failure to make affirmative proof thereof.

In Admiralty. Libel by Leon E. Monnier against the United States. Decree dismissing the libel.

Decree affirmed 16 F.(2d) 815.

Matthew T. Abruzzo, of Brooklyn, N. Y. (Ralph Stout, of New York City, of counsel), for libelant.

Ralph C. Greene, U. S. Atty., of Brooklyn, N. Y. (Edgar G. Wandless, William E. Collins, and Edwin H. Mead, all of New York City, of counsel), for the United States.

CAMPBELL, District Judge. This is a suit to recover for alleged damages to cargo, consisting of 3,963 bags of quebracho extract, shipped from Buenos Aires, on July 12, 1920, on the steamship Lake Ellendale, owned by the respondent, to Boston, Mass., at which

port it arrived on September 6, 1920; the voyage having consumed about seven weeks. The libel alleges that the steamship Lake Ellendale made delivery of said cargo "short and seriously injured and damaged."

On receipt of the cargo by the ship, a bill of lading was duly issued by authority of the captain, which recited that the 3,963 bags of quebracho extract were received "in apparent good order and condition," and the said bill of lading also contained a clause which provided among others the following exception: "Heat, * * * effects of climate, * * * change of character, * * * breakage, loss of contents or weight, * * * loss or damage arising from the nature of the goods, * * * heat of holds." On the trial the libelant limited his claim for damages to 1,953 bags, it being conceded that 2,010 bags were delivered in good order and condition.

While no evidence was taken on the trial as to the amount of damages alleged, it does appear from the evidence that the price of quebracho extract was falling at the time that the libelant rejected the entire shipment of 1,953 bags, which were put in storage and about a year later purchased by libelant at public sale at a greatly reduced price, and even by his own testimony some of it was used by him.

[1] The provision in the bill of lading that the bags of quebracho extract were received "in apparent good order and condition" is only prima facie evidence that, as to all circumstances which were open to inspection and visible, the goods were in good order, and does not preclude the carrier from showing, in case of loss or damage, that the loss proceeded from some cause which existed, but was not apparent, when it received the goods, and which, if shown satisfactorily, will discharge the carrier from liability. Nelson v. Woodruff, 66 U. S. (1 Black) 156, 17 L. Ed. 97; Clark v. Barnwell, 53 U. S. (12 How.) 272, 13 L. Ed. 985; The Dondo (D. C.) 287 F. 239, 1923 A. M. C. 19; The Aki Maru (C. C. A.) 255 F. 721; The Solveig (D. C.) 217 F. 805.

Quebracho extract is obtained in the interior of the Argentine Republic, and is treated to reduce the moisture inherent to the raw material. In the final stage of manufacture, the extract, while in a molten, hot state, is poured into bags, and upon cooling hardens; the bags of necessity sticking to the quebracho. The two objects desired in the finished product, and which determine its value, are an increase in the proportion of tannin and a decrease in the proportion of moisture.

Exposure to the air tends to reduce the danger of the bags sticking together because of moisture, and as the bags, after the manufacturing process is completed, are brought down to seaboard in open, shallow boats, piled in a few layers and exposed to the air, the actual condition of the extract as to moisture cannot be determined, simply because the bags do not then stick together.

The percentage of moisture and of tannin in the finished product of quebracho extract can only be determined by a chemical analysis, and cannot be determined from any examination which officers or men engaged in receiving cargo or loading it on a ship are able to make, no matter how diligent they may be. The percentage of tannin and moisture in quebracho extract at the time it starts from the interior toward seaboard are two of the most important elements in determining whether it is in proper condition for shipment.

That quebracho extract is subject to fusing and the sticking together of bags during the voyage, from the inherent vice of too much moisture, was not only shown by the evidence, but it seems to have been accepted by the trade, because, although, as testified by the witnesses both for libelant and respondent, many cargoes come in with the bags stuck together to a greater or lesser degree, yet diligent search has failed to reveal any case in which it has been sought to recover for damages to quebracho extract shipped in bags.

[2] No evidence was offered in this case on behalf of the libelant that the quebracho extract was in good order and condition at the time of shipment, except the recital of the bill of lading of the receipt "in apparent good order and condition," which, as has been shown, relates only to the external condition, and, as quebracho extract is subject to inherent vice, proof that it was in good order and condition at the time of shipment should have been shown by the libelant. The M. C. Currie (D. C.) 132 F. 125; The Muskegon (D. C.) 10 F.(2d) 817, 1924 A. M. C. 1512; The Lyra (D. C.) 231 F. 250.

The respondent contends that, even if the quebracho extract, when shipped, was in good order and condition and proper for shipment, the damages alleged have not been shown by any competent evidence, and, if shown, the respondent was relieved from liability, as the cause of such damage was one of the other excepted causes contained in the bill of lading.

The best that can be said about the testimony of the libelant as to loss in quantity of

the extract is that it was apparently hearsay, and as to the damage testified by the libelant to have been occasioned by the extract coming into contact with iron, whether from the sides of the ship, crowbars, or pickaxes used in breaking up the cargo to remove it, or moisture which dropped from the underside of the deck overhead, it was made clear by libelant's own expert witness that the presence of iron could not be determined from mere inspection of the extract by the eye, but could only be determined by chemical analysis, and no chemical analysis showing the presence of iron was introduced in evidence.

It was shown that many of the bags were broken in removing the cargo, and that the broken portions were swept up and put into receptacles, and it was also shown that it is customary to have some sweepings in every cargo of quebracho extract.

[3] Respondent claims, and I think rightly, that the fusing together of the bags into a mass, which cooled before arrival of the ship at Boston, constituted a "change of character" of the extract, which was one of the exceptions of the bill of lading.

Libelant claimed that the proper way to stow quebracho extract was to use sawdust, and to dunnage with mats; therefore it does not seem to me that there could be any damage by particles of sawdust and parts of the mats and bags adhering to the extract when removed, because, in the way in which it was packed, the bags of necessity would have to be removed in any event, and the usual process of preparing the extract for the market was designed to eliminate any foreign substances which might become attached to the extract.

The presence of iron in the extract would reduce its value for tanning light skins, for which purpose it is used; but in the face of the evidence of the experts the libelant was clearly in error in saying that you could determine the presence of iron by looking at the pieces of extract offered in evidence, and there is therefore no evidence to sustain a finding that the extract was damaged by iron.

Regardless of whether the extract was in good order and condition when shipped, heat and the heat of the hold played a large part in the fusing and sticking together of the bags of the extract, because heat is used in the process of manufacture to reduce the solid extract to liquid form; the degree of heat required being dependent upon the percentages of tannin and moisture found in the extract.

[4] It was the winter season at Buenos Aires when the extract was shipped. When the ship passed through the equatorial region the thermometer registered 100 degrees Fahrenheit at St. Thomas. It was early fall, the first week in September, when the ship arrived at Boston, after a voyage of about seven weeks. Surely there must have been some effects of climate, which forms one of the exceptions of the bill of lading (The Aline [C. C.] 25 F. 562), as well as heat, which forms another exception. The Good Hope (C. C. A.) 197 F. 149; The St. Quentin (C. C. A.) 162 F. 883.

The respondent having shown that inherent vice, heat, heat of holds, and change of climate all played some part in causing the fusing and sticking together of the bags, the libelant cannot recover under the bill of lading in the instant suit, unless the respondent was guilty of negligence in the stowing of the extract.

There was objection to the so-called copy of the stowage plan, which was used in taking the deposition of the chief officer and was offered on the trial, and I entirely disregarded the same in arriving at my conclusion as to the stowing of the cargo. The master of the ship, however, appeared before me on the trial, and there made a diagram of the place where this cargo was stowed, and I accept as true his testimony, including the diagram made by him.

Libelant had two shipments on the ship on the voyage in question, one of 2,010 bags, which were stowed aft, and the 1,953 bags in question, which were stowed forward, as will be described. But in my opinion no inference can properly be drawn from the fact that the 2,010 bags did not fuse, while the 1,953 bags did, as it was shown that the two lots were different shipments, with different markings, and no proof was offered by the libelant to show the relative percentages of tannin and moisture in the two shipments at the time of loading, and it may well be that in the manufacture of the 2,010 bags greater success was obtained in the reduction of the percentage of moisture.

[5] The 1,953 bags in question were stowed in the between-decks between No. 1 and No. 2 hatches, but nearer No. 1 hatch, and there is no evidence that this was not ordinarily a proper place to load the extract, and I find that it was a proper place. The place of stowage was not close to the engine or boiler room, as there was some attempt to claim, as they were located aft of No. 2 hatch, and a large quantity of bones were stowed both forward and aft of the No. 2 hatch, on the between-decks between the engine and boiler room and the extract.

The libelant was clearly in error when he testified that wet salted hides were stowed next to the quebracho extract in question, separated only by dunnage boards, and he was likewise in error when he testified that the quebracho extract in question was covered by bones. The wet salted hides were stowed in the lower hold under No. 2 hatch, and the hatches between the between-deck and the lower hold were properly covered with boards and canvas properly secured, and no moisture could come through the hatches.

The only evidence offered tending to show that any moisture could come from the lower hold was that offered by a surveyor, Capt. Bagger, for whose opinion I have great respect, who said some moisture might come through the ventilators, and that slight damage might be caused. But I cannot believe or find that any sufficient quantity of moisture could come in that way to cause the whole mass of bags to fuse, when you consider the consistency of the material contained in the bags, the very high piles extending from one side of the ship to the other, the bags being double thickness, and with the contents measuring 24 inches long, 26 inches wide, and 14 inches thick, and extending up from the between-deck to within 6 inches of the upper deck.

As all of the extract fused, and not only that in the bags at the top sides and ends, it clearly was not due to the small quantity of moisture which might have come through the ventilators, but to the moisture in the material itself and while the libelant testified that there were wet bags, which I doubt, there was no evidence of any salt water having damaged the extract.

The libelant also testified that bones were stowed on top of the extract, but again I believe he erred, and I accept the testimony of the master of the ship that the bones were not stowed on top of the extract, but on the same deck and separated therefrom by dunnage mats.

In my opinion the damages, if any, to the quebracho extract, which are alleged by the libelant, were caused by a combination of heat, effects of climate, nature of the goods, and heat of holds, and they are each and all of them excepted in the bill of lading, and the respondent has clearly shown that it was not guilty of negligence in the stowage of such extract; therefore a decree may be entered in favor of the respondent dismissing the libel, with costs.

Having determined the issues of fact in favor of the respondent on the merits, I see no necessity of considering the questions of failure to give notice or commence the action in the time provided in the bill of lading, which were raised by the respondent.

[6] As to the question of jurisdiction raised by the respondent in its brief, I content myself with saying that after admitting jurisdiction in its answer, respondent cannot after the trial ask for a dismissal of the libelant's libel simply because the libelant has not made affirmative proof of what respondent has admitted, especially when there is no evidence before the court to show that the court did not have the jurisdiction which the respondent formally admitted by its answer.