# SUPPLEMENT.

## OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

A statute requiring that all goods made by convict labor in a penal institution in this or any other State, before being sold in this Commonwealth, shall be marked in such a way as to indicate conspicuously the source of their manufacture, which by its terms plainly applies to interstate commerce, would be in violation of the Constitution of the United States.

THE following order was passed by the House of Representatives on April 17, 1912, and on April 26, 1912, was transmitted to the Justices of the Supreme Judicial Court. On May 3, 1912, the Justices returned the answer which is subjoined.

ORDERED, That the opinion of the Justices of the Supreme Judicial Court be required upon the following important question of law: Would the provisions of House Bill No. 833, entitled "An Act relative to the marking of goods made in penal institutions," be constitutional and legal if enacted into law?

ORDERED, That copies of the said bill be sent to the Justices of the Supreme Judicial Court.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

We, the Justices of the Supreme Judicial Court, respectfully answer as follows the question propounded by the order of April 17, 1912, a copy of which is hereto annexed.

The bill, entitled "An Act relative to the marking of goods made in penal institutions," requires in express and unqualified terms that all goods, wares and merchandise made by convict labor in a penal institution in this or any other State, before being offered for sale in this Commonwealth, shall be branded, labelled or marked in such a way as to indicate conspicuously the source of their manufacture. Compliance with its terms is enforced by

heavy penalties. The bill applies in unmistakable language to interstate commerce. It describes specifically the manufactures made in "any other State . . . imported, brought or introduced in the State of Massachusetts." The purpose of the bill is directly to affect interstate commerce. Its aim in this respect is emphasized by certain provisions of § 2, which obviously apply to shipments in the original package. Its terms, if complied with, would compel the branding, labelling or marking of every convict-made article brought into the Commonwealth for sale in ordinary trade.

The general principle is that under the Constitution of the United States no State can pass any law which impairs or restricts in any degree the freedom of interstate commerce. Many illustrations of its scope may be found in instances of efforts to require inspection, license to sell, registration to transport or identification by color. It has been applied to a great variety of articles, some of which, such as intoxicating liquors, had been declared by the policy of the particular State as harmful to the public safety, health and order. It has been repeatedly declared that the domain of interstate commerce is within the exclusive control of Congress and that no State under the guise of regulation, restriction or otherwise, can impose any direct burden upon it. This principle is subject to the limitation that laws passed by the several States in the exercise of the police power, general in their design and valid in their nature, will not be void because incidentally, and not primarily, they may affect interstate commerce. The bounds of the police power have not been defined. The most that courts have undertaken to do is to lay down certain broad propositions and leave each case to be decided as it arises. In a wide sense, and without undertaking to mark its limits, it may be said that the police power authorizes the enactment of statutes to promote the public health, safety and morals, and the necessary welfare of society. The present bill, in our opinion, goes beyond a lawful exercise of the police power in its direct effects upon interstate commerce. Protection of domestic laborers, manufacturers or merchants against the lawful competition from other States by means of discriminating regulations upon goods manufactured in other States, is an immediate interference with interstate commerce. The circumstance that goods made by convicts in this Commonwealth

are included does not save the bill from primarily affecting commerce between the States. One who purchases prison-made goods in other States has a right as complete and extensive to sell them upon their own merits as he has to sell private-made goods of like nature.

Goods made by convicts are lawful subjects of commerce. This is recognized by the bill itself, which allows a free sale when marked. It is a restriction upon the freedom of trade in articles of legitimate business transactions to permit goods made in factories in other States to be sold freely in the market and to require goods like in every particular in all physical and commercial qualities, after being lawfully purchased in some other State, to be branded as "convict-made" before being offered for sale here. Plainly the purport of the bill is to affect the availability and attractiveness in the market of the branded or labelled goods. There is nothing wrong in the nature of things in prison-made goods. The employment of those convicted of crime in healthful labor is recognized as a necessity of confinement, whether its end be punitive or reformatory. The learning of useful trades has been established by statute as a part of the policy of this Commonwealth in the discipline and improvement of those paying the penalty prescribed for the commission of crime. It is a part of intelligent humanitarianism in the treatment of those under sentence. Such goods are not unsanitary or so inferior in quality that their sale would constitute a fraud on the public. This is manifest from the bill, which in § 5 excepts from its terms goods, wares and merchandise used by the Commonwealth, or by any county or municipality therein, or by any public institution. It cannot be presumed that the general public needs a protection in these respects which is denied to instrumentalities of government and to benevolent, educational, and other charitable and public institutions. Differences in grade of workmanship, if there are any, would be as apparent without branding as in like products made in private shops. The bill is wholly different from the provisions of St. 1909, c. 514, §§ 106–111, which clearly are in the interest of the public health and do not relate to interstate commerce.

The result is that we feel constrained to advise that House Bill 833, if enacted, would be unconstitutional. This is the inevitable conclusion from doctrines announced and applied in judgments of

the United States, by which we are bound. *Hall* v. *DeCuir*, 95 U. S. 485. *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489. *Bowman* v. *Chicago & Northwestern Railway*, 125 U. S. 465. *Leisy* v. *Hardin*, 135 U: S. 100. *Collins* v. *New Hampshire*, 171 U. S. 30. *Rearick* v. *Pennsylvania*, 203 U. S. 507. *International Text Book Co.* v. *Pigg*, 217 U. S. 91. *Dozier* v. *Alabama*, 218 U. S. 124. *Louisville & Nashville Railroad* v. *F. W. Cook Brewing Co.* 223 U. S. 70. *Plumley's case*, 156 Mass. 236. *Plumley* v. *Massachusetts*, 155 U. S. 461. It is the precise point decided· in *People* v. *Hawkins*, 157 N. Y. 1; *People* v. *Raynes*, 136 App. Div. (N. Y.) 417, affirmed in 198 N. Y. 539, 622. See also *Arnold* v. *Yanders*, 56 Ohio St. 417.

<div align="right">

ARTHUR P. RUGG.
JAMES M. MORTON.
JOHN W. HAMMOND.
WILLIAM CALEB LORING.
HENRY K. BRALEY.
HENRY N. SHELDON.
CHARLES A. DECOURCY.