AMOS BIRD CO. v. THOMPSON, Atty. Gen. of Washington, et al.

(District Court, W. D. Washington, S. D. June 24, 1921.)

No. 130–E.

1. Commerce ☞60(3)—Food ☞1—State statute requiring marking of imported eggs held valid.

Laws Wash. 1915, p. 274, as supplemented by Laws 1919, p. 290, requiring eggs imported from foreign countries and offered for sale in the state to be sold as such, and to that end that each imported egg shall

be marked, branded, or stamped with the name of the country in which it was produced, and that broken eggs or those offered for sale in other than the original form shall be similarly designated by marks on the containers or packages, but which exact no license fee and place no restrictions on dealings in or use of such eggs, *held* not unconstitutional, as imposing a restraint on foreign commerce, but within the police power of the state, and valid.

2. **Commerce ⬅⮞18—State statute within police power not invalid because incidentally affecting commerce.**

A statute enacted by a state in the exercise of its police power is not invalid, as in violation of the commerce clause of the Constitution, because it may incidentally affect foreign or interstate commerce, if such effect was not the object of the Legislature, but results from the legitimate protection of the people of the state in their health, or from fraud or deceit, intentional or otherwise.

In Equity. Suit by the Amos Bird Company against L. L. Thompson, Attorney General of the State of Washington, and others. On motion for preliminary injunction and motion to dismiss bill. Injunction denied, and motion to dismiss granted.

Kerr, McCord & Ivey, of Seattle, Wash., for complainant.

L. L. Thompson, Atty. Gen., of Olympia, Wash., and Malcolm Douglas, of Seattle, Wash., for defendants.

Before GILBERT, Circuit Judge, and CUSHMAN and NETERER, District Judges.

CUSHMAN, District Judge. This suit is one by a Connecticut corporation against certain officers of the state of Washington, to enjoin the enforcement of certain legislative acts of the state. The matter is now before the court upon application for a temporary injunction.

[1] The showing of irreparable loss may be sufficient to warrant the injunction, providing the court is satisfied as to the invalidity of the laws in question. The complaint avers:

"That the complainant is engaged in the business of buying and selling eggs and importing eggs from foreign countries into the United States and the state of Washington, and in preparing foreign eggs for shipment by breaking the same and removing the shell and placing the eggs in cans, containers and covers. * * * That said eggs are as wholesome, and are produced, handled and shipped under as sanitary conditions, as domestic eggs."

In 1915, the Washington Legislature passed a law containing the following provisions:

"All eggs imported into the state of Washington from foreign countries shall be sold as such. The case or container in which they are shipped shall have the words 'foreign eggs' displayed thereon in letters two inches high. All retailers of said eggs shall sell them from the container in which he received them and shall inform each purchaser that said eggs are foreign eggs. All restaurants, hotels, cafés, bakeries and confectioners using or serving foreign eggs must place a sign in letters not less than four (4) inches in size in some conspicuous place where the consumer entering their place of business can see it, to read 'we use foreign eggs.'" Section 1 (e).

"Every person, firm or corporation having in his possession for the purpose of sale or offering for sale or selling any eggs shall classify and brand the same with the classification provided for in section one of this act." Section 2.

"The word 'person' as used in this act shall mean and include individuals and employés or agents of individuals, firms and members of firms and their employés and agents, corporations and officers of corporations and their employés and agents." Section 4.

"Every person who shall violate any provision of this act shall be guilty of a misdemeanor." Section 5.

Laws of 1915, c. 94, pp. 274 and 275.

In 1919, a further act was passed, containing still further provisions, as follows:

"Section 1. All eggs imported from foreign countries and offered for sale in the state of Washington shall be sold as such. Each egg offered for sale in this state shall be marked, branded or stamped with the name of the country in which it was produced, and such mark shall be in legible Gothic letters in durable, indelible ink.

"Sec. 2. Broken eggs or eggs offered for sale in other than the original form shall be marked or branded as in section 1, except that such mark or brand shall be stenciled on the can, container, and cover or covers in letters two (2) inches high in black face type and in durable ink or paint, and the words 'Eggs from' shall prefix the mark or brand and such words shall be in similar type and ink or paint.

"Sec. 3. The state commissioner of agriculture shall make all necessary rules and regulations to carry this act into effect, such rules and regulations shall be filed in the office of the state commissioner of agriculture and shall be in effect thirty (30) days after such filing.

"Sec. 4. Any person violating any of the provisions of this act shall be guilty of a misdemeanor and in case of second or subsequent offense shall be guilty of a gross misdemeanor."

Session Laws 1919, c. 120, p. 290.

The provision in the latter act for stamping each egg probably repeals that part of the act of 1915 requiring the retailer to inform each purchaser that such eggs are foreign eggs.

While it is complained that these acts are in violation of the Fourteenth Amendment of the Constitution of the United States, in that they and their enforcement would deprive complainant of its property without due process of law, and, further, that they are in violation of section 12, article 1, of the Constitution of the state of Washington, upon the hearing on this application, these grounds have not been stressed, and they will not be further noticed by the court. It was complainant's sole contention upon the hearing that the acts were void because in conflict with section 8, article 1, of the Constitution of the United States, providing:

"Congress shall have power * * * to regulate commerce with foreign nations, and among the several states."

No question is raised in this case of the conflict of the statute in question with any provision of the Food and Drug Act; nor whether the removal of the tariff on eggs by Congress was in the exercise of its war powers. There is no contention in the present suit that foreign commerce is burdened because of the expense incurred in stamping the eggs and posting the signs.

It appears from the complaint that the first of the foreign egg laws, passed in 1915, has never been enforced. A prosecution was started under it early in 1916, but, upon the act being held unconstitutional by a justice of the peace, no further attempt was made to enforce it until

1919, after the passage of the second act, when a suit similar to the present was begun in the state court, which also held the act unconstitutional. It was appealed to the Supreme Court of the state, where the constitutionality of the act was upheld. Parrott & Co. v. E. F. Benson, (Wash.) 194 Pac. 986. The remittitur did not come down in that case until about May 1st of the present year.

On account of the Legislature of the state having, in 1921, about the time of the decision in the Parrott Case abolished the office of commissioner of agriculture, against whom the suit had been brought, and created the office of director of agriculture, upon whom the duties of the former office devolved, it was deemed that an appeal would not lie to the Supreme Court of the United States, and the present suit was brought.

There is no doubt that these statutes discriminate against foreign eggs, for they are singled out for the operation of the law. Therefore, unless their enactment is justified under some one of the police powers reserved to the state, they are not operative, even though the provisions in question are limited in application to a time when the eggs are no longer in foreign commerce, nor in the original package, but have become mingled with the general property of the state. Tiernan v. Rinker, 102 U. S. 123, 127, 26 L. Ed. 103.

[2] It is also true that these statutes are not rendered invalid by reason of such discrimination, if it only incidentally affects such foreign commerce, if such effect was not the object of the Legislature, but resulted from a legitimate attempt on its part to protect the people of the state in their health, or from fraud or deceit, intentional or otherwise. The remaining question, therefore, is: Is the discrimination against such commerce the incidental result of such a legitimate attempt, or, rather, has it been shown beyond reasonable question that it is not such a result? Savage v. Jones, 225 U. S. 501, at 525, 32 Sup. Ct. 715, 56 L. Ed. 1182; Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835.

Eggs, under ordinary conditions, deteriorate rapidly. Foreign importations, as a general thing, would necessitate their being brought from a considerable distance, ordinarily requiring handling and lapse of time, both of which, it is well known, tend to impair the soundness of an egg. By reason of the nature of its structure, upon casual observation, the quality, condition, and soundness of an egg are not readily disclosed.

If a state law absolutely prohibiting the sale of oleomargarine is valid, because its appearance was so like that of butter as to render it likely that a buyer would be deceived or mistaken, and purchase it for butter (Powell v. Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253), it follows, as a matter of course, that a law requiring that reasonable notice be given concerning the origin of a food, similar in such respect, which may reasonably be considered as liable to impairment because of conditions attendant upon its removal from the place of its origin to the place of its consumption, is valid, for the greater must include the less. The power to prohibit includes the power to regulate.

274 F.—45

In Corn Products Rfg. Co. v. Eddy, 249 U. S. 427, 431, 432, 39 Sup. Ct. 325, 327, 63 L. Ed. 689, a statute was involved which required a label upon syrup containers disclosing the ingredients. The court pointedly stated:

" * * * *And it is too plain for argument that a manufacturer or vendor has no constitutional right to sell goods without giving to the purchaser fair information of what it is that is being sold.* The right of a manufacturer to maintain secrecy as to his compounds and processes must be held subject to the right of the state, in the exercise of its police power and in promotion of fair dealing, *to require that the nature of the product be fairly set forth.*" Italics ours.

In Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835, the court held such statutes to be valid, provided they have a real relation to the suitable protection of the people of the state.

While not so directly in point as the three foregoing cases, the ruling in any one of the following is broad enough to sustain the acts in question: Schmidinger v. Chicago, 226 U. S. 578, 33 Sup. Ct. 182, 57 L. Ed. 364, Ann. Cas. 1914B, 284; Heath & Milligan v. Worst, 207 U. S. 338, 28 Sup. Ct. 114, 52 L. Ed. 236; Armour & Co. v. North Dakota, 240 U. S. 510, 36 Sup. Ct. 440, 60 L. Ed. 771, Ann. Cas. 1916D, 548; Hutchinson Ice Cream Co. v. Iowa, 242 U. S. 153, 37 Sup. Ct. 28, 61 L. Ed. 217, Ann. Cas. 1917B, 643; Savage v. Jones, 225 U. S. 501, at 525, 32 Sup. Ct. 715, 56 L. Ed. 1182; Patapsco Guano Co. v. North Carolina, 171 U. S. 345, 18 Sup. Ct. 862, 43 L. Ed. 191; Standard Stock Food Co. v. Wright, 225 U. S. 540, 32 Sup. Ct. 784, 56 L. Ed. 1197.

It is true that the decisions in State v. Jacobson, 80 Or. 648, 157 Pac. 1108, L. R. A. 1916E, 1180, and Ex parte Foley, 172 Cal. 744, 158 Pac. 1034, Ann. Cas. 1918A, 180, are directly opposed to the conclusion we have reached. In the first of these cases the court assumes that the law was passed, not with the object of protecting the health of the residents of the state, nor to prevent their being deceived, either intentionally or inadvertently, but that its purpose was to protect the industries of Oregon by counteracting the custom duty act enacted by Congress, admitting eggs from foreign countries duty free. If the assumption is warranted, the holding is no doubt sound.

"Nor does it make any difference that such regulations incidentally affect interstate commerce, when the object of the regulation is not to that end, but is a legitimate attempt to protect the people of the state." Sligh v. Kirkwood, 237 U. S. 52, at 60, 35 Sup. Ct. 501, 503 (59 L. Ed. 835).

If the law is reasonably calculated to protect the health, or prevent deceit, we do not feel warranted in undertaking to determine who would be otherwise benefited, and what part their interest played in the enactment of the law. The Oregon court in the Jacobson Case, supra, evidently concluded that Congress had exercised its authority in this matter, at least in so far as the public health was concerned, for in the opinion it is said:

" * * * In the present case the articles in question were imported from a foreign country. They are subject to the pure food and drug act of the United States." 80 Or. 648, 656, 157 Pac. 1108, at 1111, L. R. A. 1916E, 1180.

The court fell into error in this, we believe, at least as to eggs in their natural state. The decisions in the Foley and Jacobson Cases, supra, do not mention the cases which we have cited from the Supreme Court of the United States in support of our holding, save as below mentioned. The cases relied upon by the Oregon court—Walton v. Missouri, 91 U. S. 275, 23 L. Ed. 347, Guy v. Baltimore, 100 U. S. 434, 25 L. Ed. 743, and Commonwealth v. Caldwell, 190 Mass. 355, 76 N. E. 955, 112 Am. St. Rep. 334, 5 Ann. Cas. 879—were cases where license or wharfage charges had been exacted on account of matters wholly unrelated to the subject of the charge, thereby imposing a direct and discriminating burden on interstate commerce.

In Ex parte Foley, 172 Cal. 744, 158 Pac. 1034, Ann. Cas. 1918A, 180, the court limits its comments on the decisions of the Supreme Court of the United States to Plumley v. Commonwealth of Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, 39 L. Ed. 223, and interprets that decision as limiting the right to regulate under the police power of the state in such particulars to preventing actual fraud. As we have pointed out, the right of the state to protect itself—that is, its residents—is not so restricted. It may reasonably protect them from the danger of mistake, of inadvertently being deceived.

"* * * * And it is too plain for argument that a manufacturer or vendor has no constitutional right to sell goods without giving to the purchaser fair information of what it is that is being sold. The right of a manufacturer to maintain secrecy as to his compounds and processes must be held subject to the right of the State, in the exercise of its police power and in promotion of fair dealing, to require that the nature of the product be fairly set forth." Corn Products Rfg. Co. v. Eddy, 249 U. S. 427, at 431 and 432, 39 Sup. Ct. 325, 327 (63 L. Ed. 689).

Both the California and Oregon courts criticize the acts considered by them as not calculated to protect the public from the sale of stale eggs, and suggest that the law should be directed to, and controlled by, the age or condition of the egg itself, rather than its place of origin. It may be that a more perfect law could be devised. It may be that the Oregon statute, requiring the posting, where applicable, of the sign, "Imported eggs used here," and the California statute, requiring the sign, "Imported eggs sold here," without more, on account of a possible distrust on the part of the public because of the origin of Asiatic eggs, works to the disadvantage of Canadian eggs, where used; but dealers are not prohibited or forbidden by these acts from disclosing, even, if necessary, on the same signs, the exact country from which their eggs come. In this particular, the foregoing cases, while directly in point as to certain provisions of the Washington acts, yet the later act of the Washington Legislature, providing for the stamping of each egg with the name of the country in which it was produced, would tend to obviate this alleged objection, and therefore, to that extent, distinguish the present case from both of those decisions.

It is possible that eggs from nearby parts of Canada and Mexico would not have to be carried as far as, and in consequence would not be so old, nor exposed, to an equal extent, to damage or deterioration as, would be eggs brought from distant parts of the United States, yet it is

not what is possible under such a law that is in all cases to determine its validity. Its general and practical effect is not to be put out of sight. If, as has been argued, the quantity of the importation of eggs into the United States, save from Asia, is negligible, in view of our distance from that continent, climatic conditions, and the means of communication, the court cannot, with reason, say that the provisions of the law to which objection is made have no real relation to the sound condition of such eggs. Savage v. Jones, 225 U. S. 501, 525, 32 Sup. Ct. 715, 56 L. Ed. 1182; Standard Stock Food Co. v. Wright, 225 U. S. 540, 32 Sup. Ct. 784, 56 L. Ed. 1197.

Even as to the eggs of Canada and Mexico, the court feels that, as eggs are produced in all parts of the United States, it is warranted in presuming, in the absence of evidence to the contrary, that, as a rule, the domestic eggs—that is, those of the United States—consumed therein are fresher and less exposed to deteriorating influences than, as a whole, are the eggs imported from those countries. This, if true, would authorize the enactments.

The limits of the state's police power are difficult of determination, as is also the extent of the federal power conferred under the commerce clause, which, no doubt, accounts for the fact that the courts have not attempted to exactly define their limits. It is, therefore, not surprising that it is difficult to fix the points at which these jurisdictions touch, or the extent to which they may overlap, and that the courts are far from uniform in their holdings on these questions. The range of difference in their rulings can hardly be better illustrated than by the following language of the Supreme Court of the state of Washington:

"'In determining whether the provisions of the law bring it within the police power it is not necessary for the court to find that facts exist which would justify such legislation. If a state of facts can reasonably be presumed to exist which would justify the legislation, the court must presume that it did exist and that the law was passed for that reason. If no state of circumstances could exist to justify the statute, then it may be declared void because in excess of the legislative power.' State v. Pitney, 79 Wash. 608, 612, 140' Pac. 918, 920, Ann. Cas. 1916A, 209; Fisher Flouring Mills Co. v. Brown, 109 Wash. 680, 187 Pac. 399. In the cases cited the authorities upon which this doctrine is based are collated and discussed, and need not now be again reviewed. It is apparent that California follows a different rule, as in the Foley Case it was said: '"Imported" eggs are not necessarily stale or unwholesome eggs, and the advertising of such eggs as coming from some place without the United States tends in no manner to protect the health of the California public.' While under our doctrine we are bound to say that, unless it appears that imported eggs are in all respects equal to or better than domestic eggs, and that no set of circumstances can exist which would justify the enactment of the law, then we must presume that the Legislature had good and sufficient reasons for its enactment. While there is some evidence in the record tending to show that eggs imported from China are wholesome and equal to the domestic product, except in size, yet there is much tending to the contrary, purporting to show conditions under which eggs are produced, handled, and shipped, which might well justify the consumer in exercising a choice between domestic and such foreign eggs, and all this act can do is to identify imported eggs, either as eggs or as ingredients in other merchanise, so as to permit of such choice. Surely, if the foreign egg is entirely fresh and wholesome when placed upon our markets, it can stand upon its own merits and win its way to popular favor under its true designation. We cannot hold anything to be unjust discrimination or

unreasonable restriction which requires merchandise to be sold for just what it is, and prevents its sale as something other than it is. Hathaway v. McDonald, 27 Wash. 659, 68 Pac. 376, 91 Am. St. Rep. 889; Hutchinson Ice Cream Co. v. Iowa, 242 U. S. 153, 37 Sup. Ct. 28, 61 L. Ed. 217, Ann. Cas. 1917B, 643." Parrott & Co. v. Benson, 194 Pac. 987.

This clearly shows the Washington court asserting the state's extreme right, under the police power, and the California court contracting the state's power to its narrowest limits; the former stating that a statute is only void when "no state of circumstances could exist to justify it," and the latter, apparently, considering that the existence of such a state of circumstances must not only be demonstrated, but universal and without exception. As between the California, Oregon, and Washington decisions, we are better satisfied with the conclusion reached by the latter court, but do not mean to hold that an enactment must be held valid, unless "no state of circumstances could exist to justify the statute."

Again recurring to the ruling in Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835, which impliedly holds that it is necessary to the validity of such a statute that it have a real relation to the suitable protection of the people of the state, if any generalization upon the subject is necessary, this is sufficient. The following cases, it has been contended, require a different conclusion than that which we have reached:

In the present case, there is no license tax imposed upon one dealing in foreign eggs, which would be a direct burden upon foreign commerce. Hence the decisions in Welton v. Missouri, 91 U. S. 275, 23 L. Ed. 347, and Tierman v. Rinker, 102 U. S. 127, 26 L. Ed. 103, have no application. This is also true of the following cases, which are the same in principle: Webber v. Virginia, 103 U. S. 350, 26 L. Ed. 565; Commonwealth v. Caldwell, 190 Mass. 356, 76 N. E. 955, 112 Am. St. Rep. 334, 5 Ann. Cas. 879. The decision in Howe Machine Co. v. Gage, 100 U. S. 676, 25 L. Ed. 754, was also a license tax case, and the law was there upheld because it did not discriminate against foreign and interstate commerce.

Guy v. Baltimore, 100 U. S. 434, 25 L. Ed. 743, while not a case where a license tax had been imposed upon one dealing in the products of another state, not required of one dealing in domestic products, is the same in principle, for, in that suit, under an ordinance, the city of Baltimore undertook to charge vessels carrying products of states other than Maryland for the use of the wharves of Baltimore, a charge not exacted from vessels carrying products of Maryland. In Darnell & Son Co. v. Memphis, 208 U. S. 113, 28 Sup. Ct. 247, 52 L. Ed. 413, under a statute of Tennessee, domestic products were exempted from a general tax to which the products of other states were left liable. In Voight v. Wright, 141 U. S. 65, 11 Sup. Ct. 855, 35 L. Ed. 638, and Brimmer v. Rebman, 138 U. S. 78, 11 Sup. Ct. 213, 34 L. Ed. 862, there were involved laws prohibiting sales without inspection and a fee was charged for the inspection, both constituting a direct burden.

The foregoing cases are wholly unlike the present. A tax is a direct burden and an interference, and it matters not whether the foreign

taxed article be better or worse than the domestic—whether it be preferred or discredited. The injury here, if any, resulting is not proximately .caused by the information required to be given, unless it be a libel to tell the truth about these foreign eggs. The injury to the trader is the result of the defect, or reputed defect, inhering in the foreign eggs—a repute suffered independently of the information required to be given. It is by reason of their origin. The discredit or prejudice is on account of the added opportunity for deterioration with the time elapsing on its journey to the consumer.

In Hannibal & St. Joseph Ry. Co. v. Husen, 95 U. S. 465, 24 L. Ed. 527, a Missouri statute, held in conflict with the commerce clause, provided that no cattle from Texas, Mexico, or the Indian Territory should be driven into the state between the 1st day of March and the 1st day of November of each year. The act was held, so far as the evidence in that case was concerned, not a proper quarantine law. There was no showing that, during the months in which the importation of cattle was prohibited, all such cattle were infected, or liable to be infected, or that it was difficult to determine which were and which were not so infected. Schollenberger v. Pennsylvania, 171 U. S. 12, 18 Sup. Ct. 757, 43 L. Ed. 49, was an original package case. The statute there in question prohibited the sale of oleomargarine. There is no prohibition in the present statute of the right to deal in eggs of foreign production.

Collins v. New Hampshire, 171 U. S. 30, 18 Sup. Ct. 768, 43 L. Ed. 60, is a case which, upon casual examination, would appear more nearly in point. This was also an oleomargarine case. The New Hampshire statute provided for labeling packages as "Adulterated Butter," "Oleomargarine," or "Imitation Cheese," and, further, if the product was a substitute for butter, that it should be colored *pink.* The act was held in conflict with the commerce clause, not because it required the packages to be labeled as provided, but because of the provision requiring the oleomargarine to be given a color that would prejudice its use and sale, a prejudice not caused by indicating its true nature, but because the color given it (pink) was so foreign to that natural to such a food as to take away the appetite for it.

The acts now before this court are designed to show what the article is. Such coloring matter was not calculated to make the article look like what it was, but rather like what it was not. The case would be more nearly in point if the present law required the injection into foreign eggs of a red coloring matter before permitting them to be offered for sale. That this is the effect of the ruling in that case is shown by the following from the opinion:

"In a case like this it is entirely plain that, if the state has not the power to absolutely prohibit the sale of an article of commerce like oleomargarine in its pure state, it has no power to provide that such article shall be colored, or rather discolored by adding a foreign substance to it, in the manner described in the statute. Pink is not the color of oleomargarine in its natural state. The act necessitates and provides for adulteration. It enforces upon the importer the necessity of adding a foreign substance to his article, which is thereby rendered unsalable, in order that he may be permitted lawfully to sell it. If enforced, the result could be foretold. To color the substance as

provided for in the statute naturally excites a prejudice and strengthens a repugnance up to the point of a positive and absolute refusal to purchase the article at any price. The direct and necessary result of a statute must be taken into consideration when deciding as to its validity, even if that result is not in so many words either enacted or distinctly provided for. In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect. Henderson v. Mayor of New York, 92 U. S. 259; Morgan's Steamship Co. v. Louisiana, 118 U. S. 455, at 462. Although under the wording of this statute the importer is permitted to sell oleomargarine freely and to any extent, provided he colors it pink, yet the permission to sell, when accompanied by the imposition of a condition which, if complied with, will effectually prevent any sale, amounts in law to a prohibition. If this provision for coloring the article were a legal condition, a Legislature could not be limited to pink in its choice of colors. The legislative fancy or taste would be boundless. It might equally as well provide that it should be colored blue or red or black. Nor do we see that it would be limited to the use of coloring matter. It might, instead of that, provide that the article should only be sold if mixed with some other article which, while not deleterious to health, would nevertheless give out a most offensive smell. If the Legislature have the power to direct that the article shall be colored pink, which can only be accomplished by the use of some foreign substance that will have that effect, we do not know upon what principle it should be confined to discoloration, or why a provision for an offensive odor would not be just as valid as one prescribing the particular color. The truth is, however, as we have above stated, the statute in its necessary effect is prohibitory, and therefore upon the principle recognized in the Pennsylvania cases it is invalid." Collins v. New Hampshire, 171 U. S. 30, at 33 and 34, 18 Sup. Ct. 768, 769 (43 L. Ed. 60).

In the foregoing case, it was the coloring matter that hurt, and not the truth, of which, alone, complaint is made in the present case.

In Minnesota v. Barber, 136 U. S. 313, 10 Sup. Ct. 862, 34 L. Ed. 455, a statute of the state of Minnesota was involved which provided that no meat should be sold within the state unless inspected within 24 hours before the slaughter of the animal. The purpose of such a statute was to prevent the importation of meat products. Under the terms of this statute, live stock alone could be brought in for slaughter or brought in for inspection, and thereafter taken out for slaughter and returned, all within 24 hours of inspection. Such a provision, while purporting to be one of regulation, judged by its necessary effect, was virtually one of prohibition, accomplished by requiring conditions practically impossible of performance. That this is the ruling in that case is shown by the following:

" * * * It is one thing for a state to exclude from its limits cattle, sheep, or swine, actually diseased, or meats that, by reason of their condition, or the condition of the animals from which they are taken, are unfit for human food, and punish all sales of such animals or of such meats within its limits. It is quite a different thing for a state to declare, as does Minnesota by the necessary operation of its statute, that fresh beef, veal, mutton, lamb or pork—articles that are used in every part of this country to support human life—shall not be sold at all for human food within its limits, unless the animal from which such meats are taken is inspected in that state, or, as is practically said, unless the animal is slaughtered in that state." 136 U. S. at page 328, 10 Sup. Ct. 867, 34 L. Ed. 455.

The ruling in In re Ware (C. C.) 53 Fed. 783, is fairly disclosed by the syllabus:

"In the absence of proof that alum in baking powder is deleterious to health, Gen. Laws Minn. 1889, c. 7, § 1, as amended by Gen. Laws Minn. 1891, c. 119,

declaring it a misdemeanor to sell baking powder containing alum, unless the package have a label stating that it contains alum, violates Const. U. S. art. 1, § 8, granting to Congress the power to regulate interstate commerce, in so far as it relates to original packages imported from another state."

The holding in In re Schechter (C. C.) 63 Fed. 695, is stated in the syllabi, as follows:

"A state statute requiring every person selling fruit trees or other nursery stock grown outside the state to file an affidavit with the secretary of state, and a bond of $2,000, and to exhibit to each purchaser a certificate of the Secretary that he has complied with these provisions (Laws Minn. 1887, c. 196, §§ 1–3), is unconstitutional, as imposing vexatious and annoying restrictions upon interstate commerce (article 1, § 8, cl. 3), and cannot be upheld on the ground that it is intended to protect the citizens of the state from the fraudulent representations of such dealers.

" 'When a state undertakes by statute to deprive citizens of other states who deal in sound articles of commerce produced in those states of that presumption of honesty and good intent which it indulges in favor of its own citizens who deal in its own products, and which the law raises in favor of every man, it effectually deprives the citizens of those states of some of the most valuable privileges and immunities its own citizens' enjoy.' "

Both of these decisions are by Judge Sanborn. While the first of these cases was an original package case, the language of the decision is not so confined, and it cannot but be admitted that the opinion supports complainant's contention. The first of these cases was decided in 1892, and the second in October, 1894. In December, 1894, the Supreme Court decided Plumley v. Mass., 155 U. S. 461, 15 Sup. Ct. 154, 39 L. Ed. 223, wherein it was held:

"The statute of Massachusetts of March 10, 1891, c. 58, 'to prevent deception in the manufacture and sale of imitation butter,' in its application to the sales of oleomargarine artificially colored so as to cause it to look like yellow butter and brought into Massachusetts, is not in conflict with the clause of the Constitution of the United States investing Congress with power to regulate commerce among the several states."

In the course of the opinion, the court said:

"It will be observed that the statute of Massachusetts which is alleged to be repugnant to the commerce clause of the Constitution does not prohibit the manufacture or sale of all oleomargarine, but only such as is colored in imitation of yellow butter produced from pure unadulterated milk or cream of such milk. If free from coloration or ingredient that 'causes it to look like butter,' the right to sell it 'in a separate and distinct form, and in such manner as will advise the consumer of its real character,' is neither restricted nor prohibited. It appears, in this case, that oleomargarine, in its natural condition, is of 'a light-yellowish color,' and that the article sold by the accused was artificially colored 'in imitation of yellow butter.' Now, the real object of coloring oleomargarine so as to make it look like genuine butter is that it may appear to be what it is not, and thus induce unwary purchasers, who do not closely scrutinize the label upon the package in which it is contained, to buy it as and for butter produced from unadulterated milk or cream from such milk. The suggestion that oleomargarine is artificially colored so as to render it more palatable and attractive can only mean that customers are deluded, by such coloration, into believing that they are getting genuine butter. If any one thinks that oleomargarine, not artificially colored so as to cause it to look like butter, is as palatable or as wholesome for purposes of food as pure butter, he is, as already observed, at liberty under the statute of Massachusetts to manufacture it in that state or to sell it there in such manner as to inform the customer of its real character. He is only forbidden

to practice, in such matters, a fraud upon the general public. The statute seeks to suppress false pretenses and to promote fair dealing in the sale of an article of food. It compels the sale of oleomargarine for what it really is, by preventing its sale for what it is not. Can it be that the Constitution of the United States secures to any one the privilege of manufacturing and selling an article of food in such manner as to induce the mass of people to believe that they are buying something which, in fact, is wholly different from that which is offered for sale? Does the freedom of commerce among the states demand a recognition of the right to practice a deception upon the public in the sale of any articles, even those that may have become the subject of trade in different parts of the country?" 155 U. S. at pages 467, 468, 15 Sup. Ct. 156, 39 L. Ed. 223.

The scope of the court's ruling is further indicated by the language of Chief Justice Fuller in his dissenting opinion:

"I deny that a state may exclude from commerce legitimate subjects of commercial dealings, because of the possibility that their appearance may deceive purchasers in regard to their qualities. In the language of Knowlton, J., in the dissenting opinion below, I am not 'prepared to hold that no cloth whose fabric is so carded and spun and woven and finished as to give it the appearance of being wholly wool, when in fact it is in part cotton, can be a subject of commercial transactions, or that no jewelry which is not gold, but is made to resemble gold, and no imitations of precious stones, however desirable they may be considered by those who wish to wear them, shall be deemed articles of merchandise in regard to which Congress may make commercial regulations." 155 U. S. at page 481, 15 Sup. Ct. 161, 39 L. Ed. 223.

We conclude that to the effect of the latter decision may be attributed the fact that the rule laid down by Judge Sanborn in the two foregoing cases does not appear to have been followed in any reported decision.

In People v. Hawkins, 85 Hun, 43, 32 N. Y. Supp. 524, it was held:

"Laws 1894, c. 698, requiring goods made by convict labor to be labeled as such when exposed for sale in New York, is repugnant to the interstate commerce clause of the federal Constitution."

In that case the statute was limited in application to goods produced in any state except New York by convict labor. It was later sought to avoid the effect of this decision by passing such a law applicable alike to such goods produced in any state. The object sought was held not to have been accomplished. People v. Hawkins, 157 N. Y. 1, 51 N. E. 257, 42 L. R. A. 490, 68 Am. St. Rep. 736. In that decision, however, the court points out that the district attorney had stated, and the court agreed, that the sole object of the legislation was to save workmen from competition with convict labor. It is clear, as in the Oregon case, that, if the assumption is correct, the holding is sound. The court quoted from the district attorney's brief as follows:

" * * * It is against sound public policy to compel workmen, who have to support their families by their daily earnings, to compete with the unpaid labor of convicts in penal institutions. The framers of the state and federal Constitutions never intended to create and foster such competition." 157 N. Y. 6, 51 N. E. at page 258, 42 L. R. A. 490, 68 Am. St. Rep. 736.

The court said:

" * * * It is not claimed that there is any difference in the quality of this scrubbing brush when compared with one of the same grade or character made outside the prisons. There is no pretense that the act was passed to sup-

*press any fraudulent practice*, or that any such practice existed with respect to such goods. The validity of the law must depend entirely upon the exercise of the police power to enhance the price of labor by suppressing, through the instrumentality of the criminal law, the sale of the products of prison labor." 157 N. Y. 7, 51 N. E. at page 258, 42 L. R. A. 490, 68 Am. St. Rep. 736.

The same consideration, evidently, controlled the court in In re Opinion of the Justices, 211 Mass. 605, 607, 98 N. E. 334, 336 (Ann. Cas. 1913B, 815), for the court points out:

" * * * It is a restriction upon the freedom of trade in articles of legitimate business transactions to permit goods made in factories in other states to be sold freely in the market and *to require goods alike in every particular in all physical and commercial qualities*, after being lawfully purchased in some other state, to be branded as 'convict-made' before being offered for sale here. *Plainly, the purport of the bill is to affect the availability and attractiveness in the market of the branded or labeled goods.* There is nothing wrong in the nature of things in prison-made goods. The employment of those convicted of crime in healthful labor is recognized as a necessity of confinement, whether its end be punitive or reformatory. * * * *Such goods are not unsanitary or so inferior in quality that their sale would constitute a fraud on the public.* * * * *Differences in grade or workmanship, if there are any, would be as apparent without branding as in like products made in private shops.*"

Not so here; the workmanship upon a scrubbing brush may be apparent, but the condition of the contents of an egg is not to be seen of all men. Both of the above decisions were, in part, controlled by the effect a different determination would have upon the humanitarian policy which the court considered had been adopted by the state in the treatment of its prisoners—teaching trades and striving to foster industrious habits.

The effect reasonably to be anticipated from such branding would be the arousing of a prejudice—a prejudice based, not on any quality or condition or anything that might reasonably be considered as touching the quality or condition of the goods, but solely because of their origin—because of their having been produced by convicted criminals. The fact that a manufactured article is convict-made bears in no way upon its quality or merit; but an egg is such a perishable thing that it is liable, or may not unreasonably be considered as liable, to injury, both by reason of aging and by reason of handling and other conditions attendant upon transportation from abroad. Aki Maru, 255 Fed. 721, 167 C. C. A. 67; Hazelwood Co. v. Tamba Maru, 274 Fed. 696, decided November 5, 1919, Cushman, District Judge. It cannot truthfully be said that the compliance with a requirement that eggs be branded with the name of the country where they are produced would furnish information having no bearing upon, or relation to the quality, merit, or soundness of such eggs.

It is, of course, true that a foreign article of commerce is entitled to compete in the domestic market upon its merits. It appears to this court that this is exactly what this law requires—that is, that these foreign eggs shall compete on their merits and on that alone; that they shall not compete upon the strength of a credit or reputation secretly borrowed from the domestic eggs. For hundreds of years the cuckoo, which lays its eggs among those in the nests of other birds, has been

held up as a type of fraud. The legislative acts now considered condemn little more, and, by this bill, we are asked to sanction little less, than such action.

Without the power conferred by the commerce clause, doubtless, the United States would be but a loose federation of states, and, for that reason, the courts should jealously guard the authority arising thereunder. But we are not convinced that the perpetuity of our institutions depends upon concealing, or preserving the right to conceal, from the individual the nature of the contents of his alimentary canal.

The temporary injunction will be denied, and the motion to dismiss granted.

GILBERT, Circuit Judge, and NETERER, District Judge, concur.

━━━━━━━━━

C. NOEL LEGH & CO., Limited, v. STITZINGER et al.

(District Court, E. D. Pennsylvania. July 13, 1921.)

No. 8046.

Sales ⊂⊃172—Conditions requiring delivery of lumber by seller held not fulfilled.

A contract, evidenced by correspondence, by which defendants agreed to sell and deliver in Liverpool certain lumber within 60 days, providing ocean rates not exceeding $1 per 100 pounds could be secured, or plaintiff would consent to absorb the excess, if higher rates were paid, but expressly providing that, if such rates could not be obtained, defendants were not required to hold the lumber and the contract should be considered canceled, *held* not extended as to time by further correspondence, and, the conditions for shipment not having been met within the time, defendants *held* not chargeable with breach of contract for refusal to ship thereafter.

At Law. Action by C. Noel Legh & Co., Limited, against George G. Stitzinger and others, trading as G. G. Stitzinger & Co. On affidavit of defense raising question of law. Judgment for defendants.

Carr & Steinmetz, of Philadelphia, Pa., for plaintiff.
John J. Sullivan, of Philadelphia, Pa., for defendants.

⊂⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes