[Crim. No. 3507. In Bank.—October 21, 1932.]

In the Matter of the Application of MINOR E. BEAR for a Writ of Habeas Corpus.

Lyon, Fleming & Robbins and Clay Robbins for Petitioner.

Charles P. Johnson, City Prosecutor, and John L. Blank and Joe W. Matherly, Deputies City Prosecutor, for Respondent.

Milton D. Sapiro, as *Amicus Curiae* on Behalf of Respondent.

LANGDON, J.—This is a petition for a writ of *habeas corpus*. Petitioner was arrested on November 2, 1931, in Los Angeles, and charged with violation of an act (Stats. 1931, chap. 280, p. 584; 1 Deering's Gen. Laws, 1931, Act 2214, p. 1035) providing for the inspection and certification of liquid, frozen and dried eggs, and any other egg products. At the time of his arrest he was engaged in the manufacture of a meringue powder, using such egg products imported from without the United States, and failed to comply with the provisions of the act requiring that each package of his manufactured commodity be stamped with the information of such use of imported egg products. Petitioner alleges that the dried eggs or egg products used by him are pure and fit for human consumption and that they have been inspected by federal officials.

It is contended that the statute is unconstitutional, for the following reasons: First, because it interferes with the power of Congress over interstate and foreign commerce; second, because it is an unreasonable and arbitrary exercise of police power; and third, because the provision under which petitioner is charged is not embraced within the title of the act. None of these objections is, in our opinion, substantial.

A brief examination of the act and its purposes is necessary. It applies to all preserved egg products intended for human consumption, and not to whole eggs in the shell. It covers both domestic products and those imported from outside the United States. Its purposes are to secure satisfactory quality in such products, and to protect the consumer from fraud in their sale, either in the form of egg products or as part of another manufactured food product. It requires compliance with the pure food laws of this state if the egg products are prepared here; and if prepared in another state of the United States, compliance with such laws of the state of origin, and a certificate of inspection from the proper authorities. With respect to egg products imported from a foreign country, additional requirements are made. They must be inspected by our state board of health, and a certificate of inspection given to the importer or consignee, for each container. This certificate must be affixed to the container so as to be plainly visible to the buyer. The container must also have stamped upon it in letters at least two inches high the name of the manufacturer and the country where the contents were produced, and retailers must sell the products in the original container, so stamped and certified. Restaurants, hotels, cafes, bakeries and confectioneries using the imported product must keep a sign, with letters at least four inches high, in a conspicuous place, reading: ''frozen eggs (or dried eggs, or liquid eggs, or egg products, as the case may be) imported from without the United States used here''. Manufacturers of food products using such imported egg products must stamp on each package of their food product, in letters not less than one-quarter inch in size, a statement to the effect that the egg products used were imported. It is to these last two requirements that petitioner objects. He does not attack the inspection or certification provisions. He does attack the provisions requiring persons manufacturing, selling or serving food products, to give notice of the use of imported egg products. The questions before us are, therefore, first, whether the legislature can constitutionally make such a requirement; and second, whether the title of the act covers it.

In support of the argument respecting interstate commerce, petitioner cites *Oregon* v. *Jacobson*, 80 Or. 648

[L. R. A. 1916E, 1180, 157 Pac. 1108], which resembles the instant case in its facts. That decision, rendered some years ago, was criticised and disapproved in *Parrott & Co.* v. *Benson,* 114 Wash. 117 [194 Pac. 987], where it is said: "The Oregon court, in *State* v. *Jacobson, supra,* seems to have wholly lost sight of the fact that the portion of the act we are now considering can only operate after the eggs have lost their status as articles of foreign or interstate commerce, and have become a part of the great mass of domestic property as completely as though produced within our borders. Surely when an egg reaches a restaurant, hotel, or bakery and is taken from the package, cooked or mixed with other ingredients, and served to the guest or purchaser as food, it requires no argument or authority to establish beyond cavil that it is no longer an article of foreign commerce over which congress alone has control; otherwise no article once brought from without into the state, no matter how changed by any conceivable process, could ever become subject to state legislation; but authorities are as numerous as the question is simple. (*In re Agnew,* 89 Neb. 306 [Ann. Cas. 1912C, 676, 35 L. R. A. (N. S.) 836, 131 N. W. 817] ; *Weigle* v. *Curtice Bros. Co.,* 248 U. S. 258 [63 L. Ed. 242, 39 Sup. Ct. Rep. 124] ; *Armour & Co.* v. *North Dakota,* 246 U. S. 510 [Ann. Cas. 1916D, 548, 60 L. Ed. 771, 36 Sup. Ct. Rep. 440].)" The reasoning of the Washington court is plainly sound, and other cases may be cited to the same effect. (See *Amos Bird Co.* v. *Thompson,* 274 Fed. 702; *Crescent Cotton Oil Co.* v. *Mississippi,* 257 U. S. 129 [66 L. Ed. 166, 42 Sup. Ct. Rep. 42] ; *Capital City Dairy Co.* v. *Ohio,* 183 U. S. 238 [46 L. Ed. 171, 22 Sup. Ct. Rep. 120] ; *Patapsco Guano Co.* v. *Board,* 171 U. S. 345 [43 L. Ed. 191, 18 Sup. Ct. Rep. 862] ; *Savage* v. *Jones,* 225 U. S. 501 [56 L. Ed. 1182, 32 Sup. Ct. Rep. 715] ; *Corn Products Refining Co.* v. *Eddy,* 249 U. S. 427 [63 L. Ed. 689, 39 Sup. Ct. Rep. 325] ; *Plumley* v. *Massachusetts,* 155 U. S. 461 [39 L. Ed. 223, 15 Sup. Ct. Rep. 154] ; *Moulton* v. *Williams Fruit Corp.,* *(Cal. App.) 14 Pac. (2d) 88.)

The next argument is that the provisions in question are too unreasonable to be justified under the police power.

*A hearing was granted by the Supreme Court in the case of *Moulton* v. *Williams Fruit Corp.,* on November 9, 1932.

Respondent and *amicus curiae,* however, point to evidence before the legislature tending to show that sanitary conditions in the Orient, the source of most imported egg products, are far below those prevailing in this state, and that the ordinary inspection which can be made is seldom adequate to give an assurance of complete wholesomeness. With this and other evidence before it, the legislature was fully warranted in requiring that the use of imported products be made known to the consumer. A statute which makes such a requirement is neither unusual nor unreasonable, and it is a justifiable exercise of the police power to prevent fraud. In *Amos Bird Co.* v. *Thompson, supra,* the court said:

"Eggs under ordinary conditions deteriorate rapidly. Foreign importations, as a general thing, would necessitate their being brought from a considerable distance, ordinarily requiring handling and lapse of time, both of which, it is well known, tend to impair the soundness of an egg. By reason of the nature of its structure, upon casual observation the quality, condition and soundness of an egg are not readily disclosed.

"If a state law absolutely prohibiting the sale of oleomargarine is valid, because its appearance was so like that of butter as to render it likely that a buyer would be deceived or mistaken, and purchase it for butter (*Powell* v. *Pennsylvania,* 127 U. S. 678 [32 L. Ed. 253, 8 Sup. Ct. Rep. 992, 1257]), it follows, as a matter of course, that a law requiring that reasonable notice be given concerning the origin of a food, similar in such respect, which may reasonably be considered as liable to impairment because of conditions attendant upon its removal from the place of its origin to the place of its consumption, is valid, for the greater must include the less. The power to prohibit includes the power to regulate."

Similarly, in *Parrott* v. *Benson, supra,* it is said: "While there is some evidence in the record tending to show that eggs imported from China are wholesome and equal to the domestic product, except in size, yet there is much tending to the contrary, purporting to show conditions under which eggs are produced, handled and shipped, which might well justify the consumer in exercising a choice between domestic and such foreign eggs, and all this act can do is to identify

imported eggs, either as eggs or as ingredients in other merchandise, so as to permit of such choice. Surely if the foreign egg is entirely fresh and wholesome when placed upon our markets, it can stand upon its own merits and win its way to popular favor under its true designation. We cannot hold anything to be unjust discrimination or unreasonable restriction which requires merchandise to be sold for just what it is, and prevents its sale as something other than it is. (*Hathaway* v. *McDonald*, 27 Wash. 659 [91 Am. St. Rep. 889, 68 Pac. 375]; *Hutchinson Ice Cream Co.* v. *Iowa*, 242 U. S. 153 [Ann. Cas. 1917B, 643, 61 L. Ed. 217, 37 Sup. Ct. Rep. 28].)''

*In re Foley*, 172 Cal. 744 [Ann. Cas. 1918A, 180, 158 Pac. 1034], held invalid a statute requiring each imported egg to be stamped, without making any general provision for inspection, or regulating the sale of eggs of inferior quality. The court was of the opinion that the excessively burdensome requirement accomplished no legitimate object. The opinion recognized, however, that a statute properly framed could validly regulate the sale of imported eggs, and this is undoubtedly the law, as the cases cited above demonstrate. The provisions of the statute involved herein are not too burdensome, and, coupled with the general plan of inspection, they tend to protect the individual consumer against deception.

The final question is whether the title of the act is sufficient to cover the provisions which are attacked, as required by article IV, section 24, of the California Constitution. The said title reads as follows: ''An act to provide for the inspection and certification of liquid eggs, frozen eggs and dried eggs and any other egg products produced in the state of California from without the United States for the purpose of human consumption; to prescribe certain powers and duties of the state department of public health with respect thereto, and to provide penalties for violations of the provisions of this act.'' Specifically, the question is whether the requirements of labeling the container of food in which imported egg products are used, and posting notice of such use in places where food is served, are reasonably related to the ''inspection and certification'' of egg products. We think that they are. Provisions for labeling or branding products are within the purpose of statutes

providing for inspection because they tend to assist the inspection. Knowledge of where the imported product is used is essential to an adequate system of inspection, and identification by stamping the container is of great value. With respect to food served in restaurants, etc., no mark can be placed upon the food served, and the substitute therefor, a notice posted in the place where the food is served, fulfills the same purpose. Furthermore, the term "certification" may, in its broad sense, refer to the giving of information describing the quality or contents of certain food products—certifying to their origin, in this case. We have had occasion to point out in an increasing number of decisions that a liberal rule should prevail in the interpretation of the constitutional requirement of a descriptive title, and that nothing more is required than a reasonably intelligent reference to the subject of the legislation. " . . . The title of an act need not embrace an abstract or catalogue of its contents, but need only contain a reasonable intimation of the matters under legislative consideration. . . . The general subject need not appear in the title, if it is clearly disclosed or readily inferred from the details expressed." (*Heron* v. *Riley*, 209 Cal. 507, 510, 511 [289 Pac. 160, 161]; see, also, to the same effect, *Pacific Coast Dairy* v. *Police Court*, 214 Cal. 668 [80 A. L. R. 1217, 8 Pac. (2d) 140]; *Evans* v. *Superior Court*, 215 Cal. 58 [8 Pac. (2d) 467]; *In re Halck*, 215 Cal. 500 [11 Pac. (2d) 389].) In *Pacific Coast Dairy* v. *Police Court, supra,* the title of the act declared the purpose to be to prevent the *manufacture* and *sale* of unwholesome dairy products, and to regulate the business of producing, buying and selling dairy products. One of its sections provided that every person finding or receiving milk bottles marked with a registered brand should return them to the owner thereof. The constitutionality of this section was upheld, the court saying (214 Cal. 668 [80 A. L. R. 1217, 8 Pac. (2d) 140, 144]): " . . . where the legislature has deemed it necessary in order to prevent the sale and delivery of unwholesome dairy products to require the branding or marking of the containers in which such products are sold or delivered then the prohibition of the unlicensed use of such containers by those who are not entitled to use them is a reasonable regulation to that end and germane to the general subject matter contained in the

title. . . . '' In *Cocoa Cola Bottling Co.* v. *Mosby,* 289 Mo. 462 [233 S. W. 446], the title stated that the act was to provide for ''the inspection'' of soft drinks, and it contained a provision for labels showing the nature of the beverage. The provision was upheld. In *State* v. *McKinney,* 29 Mont. 375 [1 Ann. Cas. 579, 74 Pac. 1095], a title which referred to the creation of the office of meat and milk inspector was held sufficient to cover a requirement that milk conveyances carry a license. In *People* v. *Worden Grocer Co.,* 118 Mich. 604 [77 N. W. 315], a title referring to the manufacture and sale of vinegar was held to cover a requirement of branding and labeling with the name of the substance from which it was made. In *State* v. *Snow,* 81 Iowa, 642 [11 L. R. A. 355, 47 N. W. 777], the title referred to fraud in the sale of lard, and it was held to cover a provision that persons selling any mixture of substances for use as lard must use a label stating that it was ''compound lard'', and setting forth the proportion of each ingredient. It is unnecessary to carry this review further. The title of the act in question is sufficient, under the test applied by us in numerous cases.

There being no merit in any of the constitutional objections raised by petitioner, the writ is discharged.

Seawell, J., Shenk, J., Waste, C. J., and Tyler, J., *pro tem.,* concurred.

PRESTON, J., Dissenting.—I dissent.

This *habeas corpus* proceeding presents the question of the constitutionality of certain provisions, hereinafter quoted, of chapter 280, Statutes of 1931, pages 586, 587.

Petitioner, in his business of manufacturing food products for human consumption, used imported dried egg powder which was pure, sweet and in every way wholesome food and had been inspected and certified by federal officials at the time of its importation; however, he neglected and failed to comply with the provisions of said statute requiring him to post a sign or print a statement respecting his use of such import. He was, therefore, charged, under two criminal complaints, with violation of these provisions, and by this writ of *habeas corpus* he later secured his release upon bail. He claims that he is entitled to a full discharge from custody because the said statute is unconstitutional and void

in that it unduly interferes with and restricts foreign and interstate commerce; that it is discriminatory and that it is an unwarranted exercise of the police power, burdening foreign and interstate commerce, in violation of the protection afforded by the federal Constitution. However, these questions will not be considered, because I am reluctantly led to hold the view that the portions of the act here under review are not properly referred to in the title as required by section 24 of article IV of the Constitution. In this conclusion I am mindful, too, of the liberality with which we are to apply this provision, as shown by numerous decisions, several of the later cases being *McClure* v. *Riley*, 198 Cal. 23 [243 Pac. 429], *Heron* v. *Riley*, 209 Cal. 507 [289 Pac. 160], and *In re Halck*, 215 Cal. 500 [11 Pac. (2d) 389].

The title to the act in question is: "An act to provide for the *inspection* and *certification* of liquid eggs, frozen eggs and dried eggs and any other egg products produced in the state of California and within the United States and imported into the state of California from without the United States for the purpose of human consumption; to prescribe certain powers and duties of the state department of public health with respect thereto, and to provide penalties for violations of the provisions of this act."

Section 1 of the act provides for the production of egg products under sanitary conditions where produced in California or the United States. Section 2 provides that such egg products imported into this state from without the United States shall be sold in this state subject to inspection and labeling as provided for later in the act. Section 3 provides that such products shall not be sold until inspected by the state board of health and until a permit shall be issued by that board. It further provides that such products shall be sold only from the original containers upon which shall appear a certificate of the board of health in black letters, not less than one inch high, to the effect that the article was imported into the state from without the United States and had been inspected upon a certain day by the state board of health. Section 4 provides that importers and wholesale distributors of such products shall, when requested, furnish said board a record of the manufacturers to whom such products are sold in order to facilitate inspection. Section 5 provides that the container in which such imported products are sold shall have a label,

not less than two inches high, giving the name of the manufacturer and country of manufacture and that all retailers shall sell the products from said container and shall inform each purchaser of the origin of said products. Then follow the provisions here under review (being the remainder of said section 5), which read as follows:

"All restaurants, hotels, cafes, bakeries and confectioneries using or serving frozen eggs, dried eggs, liquid eggs or other egg products imported from without the United States must place a sign in letters not less than four inches high in some conspicuous place in their places of business so that the consumer or customer entering their places of business can see it, which sign shall read 'frozen eggs (or dried eggs, or liquid eggs, or egg products, as the case may be) imported from without the United States used here'. All manufacturers of any food products using liquid eggs, frozen eggs, dried eggs or other egg products imported from without the United States in the manufacture of food products shall stamp on each individual package or container of said food products in letters not less than one-quarter inch in size a statement to the effect that frozen eggs (or liquid eggs, or dried eggs, or other egg products, as the case may be) imported from without the United States have been used in the manufacture of this product."

It seems too clear for controversy that the inspection and certification of such eggs and egg products provided for by the title, suggests only that the products, before reaching the channels of trade in this state, be inspected as to their fitness for human consumption and, if found so fit, that this fact be authenticated by official authority. Indulging the utmost liberality in the consideration of this title, the mind cannot come to rest upon the proposition that a restaurateur, by displaying a conspicuous sign in a conspicuous place to the effect that he is using the article already inspected and certified, in the manufacture of other food products, is thereby further certifying to its wholesomeness for consumption. Manifestly the object of these latter provisions is to discourage the consumption of these articles and to restrict the sale and use thereof rather than to proclaim or certify to their virtue as food. In short, the provisions in question can be properly referred to only by a title covering regulation of the sale and use of such prod-

546

ucts, for the equivalent of which reference we look in vain to the title of this act. The word "certification" as used in the title thereof can by no stretch of the imagination be held a sufficient reference to the provisions here under discussion, which are regulatory provisions to be observed in the sale or use of the products after they have lost their identity as articles of commerce. The legislature of the state of Washington enacted substantially similar legislation and used as its title the following: "An act relating to and .regulating the sale of eggs providing for the classification, labeling and marking thereof and providing penalties for violation thereof". (*Parrott & Co.* v. *Benson et al.*, 114 Wash. 117 [194 Pac. 986].) For the above reasons it is my opinion that the writ should be sustained and the prisoner discharged.

Curtis, J., concurred.